ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY *v.* BIRD.

Opinion delivered January 20, 1913.

1. PLEADING—AMENDMENT TO CONFORM TO THE PROOF.—Where there is no charge of negligence, in the complaint, and the defendant does not demur, but answers denying negligence and setting up contributory negligence, and plaintiff without objection introduces evidence of defendant's negligence, after judgment the complaint will be treated as amended to conform to the proof. (Page 183.)

2. DAMAGES—PERMANENT INJURY.—In a suit for damages for personal injuries, where there is no testimony tending to show with reasonable certainty that the injury is permanent, it is error for the trial court to permit the jury to assess any damages for permanent injury. (Page 186.)

3. DAMAGES—FUTURE SUFFERING.—In an action for damages for personal injuries, where the evidence shows that plaintiff will suffer considerable pain in the future, by reason of said injuries, the jury may consider future suffering in fixing the amount of damages. (Page 189.)

4. DAMAGES—REMITTITUR.—Where a jury was erroneously permitted to consider the question of permanent injuries in assessing damages in an action for damages for personal injuries, and assessed said damages at $11,000, the effect of the error will (under the facts) be eliminated by the entering by the appellee of a remittitur for the sum of $6,000. (Page 190.)

Appeal from Union Circuit Court; *George W. Hays,* Judge; reversed, unless remittitur is entered.

STATEMENT BY THE COURT.

J. H. Bird, as next friend of Wharton Bird, brought this suit in the Union Circuit Court against appellant to recover damages for injuries to Wharton Bird alleged to have been caused by the negligence of appellant. Judgment was rendered in favor of the appellee in the sum of $11,000. While considering the motion for a new trial the court offered to require the appellee to remit the sum of $3,000 if the appellant would waive errors and accept judgment in the sum of $8,000. This the appellant declined to do and the motion for a new trial was overruled and appellant duly prosecutes its appeal.

The facts are substantially as follows: Hillsboro street in El Dorado runs east and west and crosses four or five tracks of appellant's railroad, which runs north and south. The east track is the Newport Stave Mill switch, and the track next west of it is No. 4, on which the accident happened. J. H. Bird and Wharton, his seven-year-old son, were driving in a wagon loaded with cottonseed hulls, going westward on Hillsboro street about 2 o'clock in the afternoon on November 15, 1910, and were approaching the railroad tracks with the inten-

tion of crossing them. As they got to the first track there were to their right and north of the street a stave mill and a loading platform, and on the first track several freight cars. A switch engine was at the time north of the street and running southward on the second track approaching the crossing. Just before Bird got to the crossing he checked his team by pulling the lines, but did not stop. He slowed up and looked and listened for trains. He didn't hear any because the stave mill was running. The track next to the stave factory, as far as he could see, was covered with box cars. There were some cars standing on some of the tracks to the left, but they didn't come as close on that side as they did on the other. There was a car right up to the crossing on the right-hand side that kept him from seeing the track. That was the direction the engine was coming from. He could not see the track at all in that direction and could not see the engine. After he looked for it and could not see it he drove on the track without knowing whether or not the engine was coming back of those cars. He knew there were switch engines constantly running around there. He didn't get out to look for it and that is the only way that he could have seen it, and he does not know whether he could have seen it then or not because there was a curve to the east. It would not have been out of his sight until it was about 200 yards from where the accident occurred.

The wagon was loaded bed-full. He whipped his ponies in order to get across as soon as he could. He was sitting with his feet hanging off the front end of the wagon body. Wharton, his son, was sitting right about the middle of the wagon. When he passed beyond the cars he saw the engine forty or fifty feet away. He knew then that they could not get across. He made a grab at the child with his left arm and missed it. When he hit the ground he looked up and saw the child about six feet up in the air, his feet up and head down. The engine had knocked the wagon from under him. He was lying within two feet of the drive wheels of the

engine in an unconscious condition, making a whining noise.

The testimony on behalf of appellee showed that the bell was not ringing nor the whistle blowing as the engine approached the crossing. There was testimony on behalf of the appellant tending to show that the bell was ringing up to the time the engine hit the wagon, but the decided preponderance of the evidence was to the effect that no signals were given as the engine approached the crossing where the accident occurred.

The testimony on behalf of appellant tended to show that the standing cars on the track near the crossing were flat cars loaded with bolts; that the engine could be seen above these cars by one standing on the ground, and necessarily by those in wagons; that Bird and his son were both looking towards the south and didn't look towards the north, whence the engine was coming. The engine ran only a few feet to the opposite side of Hillsboro street after it struck the wagon.

The testimony was conflicting as to the speed of the engine as it approached the crossing. One witness testified that the engine was running twelve or fifteen miles an hour; others said it was running four or five miles an hour. As the engine approached the crossing, the testimony tended to show that there was a switchman standing on the footboard at the front end looking ahead; that the engineer was also in his cab looking out ahead.

There was testimony on behalf of the appellant that the switchman saw Bird's team as soon as it appeared from behind the standing freight cars on the first track and at once shouted and continued to shout until he had to step off to avoid being hit.

The engineer testified that he put on the brakes in emergency as soon as he saw the horses' heads on the track, and saw them just as soon as they came in his line of vision, and the engine was then only a few feet from the wagon. There was testimony tending to show that the boy fell on his head in the street, making a wound like a cow-lick in his hair, grinding the dirt and cinders into the hide, not breaking the skin; that he was unconscious

from the fall, and there was no physical evidence of injury except the bruise on his head. The next day his temperature was 101, showing fever, and on the way home after the accident he vomited a little blood, and passed blood in his urine for twenty-four or thirty-six hours afterwards.

About four days after the accident the boy had a spasm and nervous spell in which his limbs jerked and he cried and appeared nervous and frightened, which lasted several minutes, and these spells occurred about every one to three weeks from that time on to the date of the trial, a period of eleven months. They lasted from five to forty minutes.

Before the accident he was a quiet child. Since the accident he has been very nervous and irritable; "seems to like more racket than he did before." He played and went more than he did before. Before the accident his health was good; never had any symptoms of being nervous. Since the accident he had lost flesh and his appetite was poor.

The testimony of physicians showed that the child had an adherent prepuce, that is, the foreskin adhered to the head of the penis a part of the way around. This was congenital.

There was testimony of physicians as experts on behalf of the appellee showing that in their opinion the adherent prepuce as described in the case of Wharton Bird would not cause the physical condition that he was in. They "would attribute his condition to the fright and traumatism rather than to the adhesion of the prepuce to the penis."

On the other hand, physicians as experts testified that in their opinion the physical condition of the child was produced by the adherent prepuce rather than by the injuries. The physicians concurred in the opinion that it would require only a simple operation to correct the adherent prepuce. The testimony of physicians as experts also tended to show that an adherent prepuce would produce the symptoms present in the affliction of Wharton Bird. The plaintiff offered to have the boy

produced before the jury if appellant desired, but the child·was not before·the jury.

Other facts will be stated in the opinion.

*E. B. Kinsworthy, H. S. Powell* and *R. E. Wiley,* for appellant.

1. "In order to justify the assessment of damages for future or permanent disability, it must appear that a continued or permanent disability is reasonably certain to· result from the injury complained of." 13 Cyc. 144; 3 Hutchinson on Carriers, § 805; 3 Kan. App. 693, 43 Pac. 802; 104 Ind. 264; 107 Ind. 32; 45 Ia. 416; 47 Hun, 429; 15 N. Y. St. Rep. 11; 75 N. W. 231, 72 Minn. 291; 90 S. W. 1155, 111 Mo. App. 706. See 90 Ark. 278, 284.

No recovery can be had for "probable" future suffering, or "probably" permanent injury. 97 Ark. 358, 365. See also 89 Wis. 371, 46 Am. St. Rep. 849; 46 Neb. 907; 45 Ill. App. 44; 20 Barb. 282; 30 L. R. A. 504, 507. Instruction 2 requested by appellant should therefore have been given.

2. Instruction 6 given at appellee's request was erroneous, in that it permitted the jury to assess damages for the probable future effect of the impairment of his nervous system on his mental and physical condition. 97 Ark. 358, 365. The error in that instruction was not cured by .instructions 3 and 4, given at appellant's request, for they conflict with and contradict it, and the court can not tell which instruction the jury followed. 96 Ark. 311, 314.

3. The verdict, in the light of the evidence, is grossly excessive, being for such an amount as to evidence passion and prejudice on the part of the jury· against the appellant. Kirby's Dig., § 6215; 39 Ark. 387, 393; 5 Ark. 620, 628; 74 Ark. 327; 39 Ark. 491; 90 Minn. 499, 97 N. W. 433; 90 Ill. 74; 29 Pac. (Kan.) 1086; 27 S. W. 453, 458; 22 Fed. Cases, 1030; 31 Col. 82; 77 Pac. 78, 79, 80; 23 Pac. 560.

*Gaughan & Sifford,* for appellee.

1. It is not necessary to show that a personal injury is permanent in order to recover for an injury caused by the negligence of a railway company, and in none of the instructions given at appellee's request are the words "permanent injury" mentioned.

2. The sixth instruction correctly states the law, and differs from the instruction criticised in the St. Coner case, 97 Ark. 365, relied on by appellant, in that case the instruction required that the probable duration and probable effect of the injury to and upon the nervous system be shown by a preponderance of the evidence. 33 Ark. 350; 35 Ark. 494; 82 Ark. 392, and cases cited; 37 Ark. 522; 39 Ark. 491; 55 Ark. 386; 65 Ark. 620; 78 N. W. 833.

3. The verdict is not excessive, and there is no evidence whatever in the record of its amount being influenced by passion and prejudice.

Wood, J., (after stating the facts.) There was no charge of negligence in the complaint, but the appellant did not demur, and answered denying negligence and setting up contributory negligence on the part of the appellee, J. H. Bird, and Wharton Bird in driving upon the railroad track in front of the approaching train without exercising reasonable care to ascertain whether or not an engine was running there and approaching said crossing before they attempted to drive thereon.

Testimony was introduced without objection tending to show that appellant's servants were negligent in failing to ring the bell or blow the whistle as they approached the crossing, and also tending to show that the train was running at a speed of twelve or fifteen miles an hour at the crossing. We will, therefore, after judgment, treat the complaint as amended to conform to the proof, and hold that it was sufficient and the evidence was also sufficient to sustain a charge of negligence in the particulars recited.

Appellant urges as one of its principal grounds for a reversal that there was no evidence to warrant the jury in finding that there was a permanent injury, and

that the court should have given appellant's prayer for instruction No. 2, which is as follows: "You are instructed that the evidence of this case does not warrant you in returning a verdict for the plaintiff based upon any permanent injury to Wharton Bird."

On the question of whether or not the injury was permanent Dr. J. W. Meek, as physician and expert, testified as follows: "From my examination of the child, and assuming as true the facts testified to, as to the injury and his condition before and after, then I would say on the question of probable result that it is a question of opinion; no man can say; assuming all these things to be true, the probabilities are he will never get better. He may develop epilepsy; the probabilities are against his complete recovery. * * * Concussion of the brain and spine immediately following an injury in some cases rapidly pass away; in others they do not. In an adult as a rule they pass away except in a woman; women are more apt to suffer from a nervous shock than a man; as a rule a child will get well from a neurasthenic condition quicker than a grown person. Neurasthenia means nerve weakness. People often entirely recover from it. The demarcation between the condition of this boy and that class of patients that do recover from neurasthenia is uncertain; you may take two children and submit them to the same conditions and one may get well and one get worse. I don't believe I know of a child not to recover from receiving a shock where there is concussion of the brain or spine. I have seen very few children suffer from that condition. I never had one in my care like this at its age, and can not say whether or not I have seen them recover. It is hard to recover from traumatic neurasthenia. The chances are better for a child to be relieved from it than a grown person on account of the mental equation. Where a person is old enough to think about themselves it is against recovery. We do not have that in little boys; they are not introspective like grown persons. If he ever gets it off his mind he will probably get well."

Then after describing other physical conditions and symptoms of the child, Doctor Meek continued his testimony as follows: "I do not find any physical injury about him. You have to take the whole assembly of symptoms together with a history of the case to find out whether you have a case of traumatic neurasthenia. I can not say that he had a single symptom pointing to a permanent injury. By taking them all together I think the probability is of having a permanent injury; that is as far as any man can go. It is just about equally balanced in my mind, I think. It is a question of opinion at last. You can not prophesy with any degree of accuracy; it is just as probable that he will get over it as it is that he will not; it is something that you can not prophesy or measure."

Dr. J. B. Wharton testified on behalf of appellee as follows: "These spells and his nervous condition is attributable to the injury that he received. That injury was calculated to produce such results. As to the probable duration of that condition, that is hard to tell. He may in time get well and he may not. It is questionable whether he will ever get entirely well, in my mind. It depends on the amount of involvement in his nervous system and nerve centers of the brain. I would say that it is possible that the boy can get well under the proper surroundings. Looking at it as a matter of probabilities, I would say it has been discouraging to me; so much so that I hardly know what to think about it. I have been in doubt about it for the last seven months. It might develop into a paralytic condition, to temporary loss of vitality, to such an extent that he would lose his health to such a degree that he would never get well. He will have to get well in the next few years or he never will get well. Neurasthenia coming from a shock could continue beyond the period of eleven months and then recover. He ought to have improved in that length of time greater than he has. Where there is no improvement within eleven months I hardly know what my judgment would be as to the probable duration of the injury. The question is hard to settle in my mind what the dura-

tion would be. These cases are such that it is hard to tell what they are going to do. * * * I do not contend that this child has at this time a concussion of the spine; he simply has the after effect. The injuries received in middle age and old life are much more liable to remain than with a child, because a child don't dwell on it and gives nature a chance to get well. Taking this child's case, I could not say that the probabilities of its recovery are greater than that it will not recover in a reasonable time. It is a doubtful case. I would not be sure that it is permanent or not.''

There was testimony by physicians as experts on behalf of the appellant to the effect that the injury was not permanent.

The court erred in not granting appellant's prayer for instruction No. 2. The testimony, viewed in the strongest light in favor of appellee, does not make it reasonably certain that Wharton Bird was permanently injured. Unless there is testimony tending to show with reasonable certainty that the injury is permanent the court should not permit the jury to assess any damages for permanent injury. *Ark. Lumber Co.* v. *St. Coner,* 97 Ark. 358. See also *Ark. & La. Ry. Co.* v. *Sain,* 90 Ark. 278; 13 Cyc. 144, and cases cited.

Mr. Hutchinson says: ''The jury may take into consideration future as well as past physical pain and suffering, but to justify them in doing so it must be made reasonably certain that such future pain and suffering are inevitable, and if they be only probable or uncertain they can not be taken into the estimate.'' 3 Hutchinson on Carriers, § 805, and cases cited; *Chicago, R. I. & P. Ry. Co.* v. *Archer,* 46 Neb. 907; *Smith* v. *Milwaukee Builders & Traders Exch.,* 30 L. R. A. 504.

The experts on behalf of appellee did not testify that in their opinion the injury to Wharton Bird was permanent. It was a matter of speculation with them as to whether it was permanent or not. This being true, it must also have been only a matter of conjecture with the jury. But to fulfill the requirements of the law there must be affirmative testimony to the effect that the injury

was permanent before the jury would be authorized to find that such was the fact, and the court should not allow the permanency of the injury to be considered as an element of damage where the witnesses themselves are uncertain as to whether there would be any permanent injury and where the nature of the injury *per se* does not show that the injury was permanent.

Appellant complains of instructions which allowed the appellee to recover if the negligence of the appellant "contributed to the injury." The specific ground of criticism is because the instruction does not say that the negligence of appellant must be the proximate cause of the injury.

If the injury resulted from appellant's negligence, then there is no question in the evidence but what such negligence was the proximate cause of the injury. Therefore, there is no prejudicial error because the instruction did not contain the qualification that appellant insists on.

The undisputed evidence shows that the proximate cause of the injury was the collision of appellant's train with the appellee's wagon, and if this collision was caused by appellant's negligence then such negligence was the proximate cause of the injury. It is a question for the jury under the evidence as to whether appellant was negligent in causing the injury, and this question, as well as the question of contributory negligence of the appellee, was submitted to the jury upon instructions free from error.

Various objections are urged to the rulings of the court in giving and refusing prayers for instructions which we deem it unnecessary to discuss here. Suffice it to say we have examined critically these objections and find that there was no error in the rulings of the court. We find no error in the rulings of the court in the admission of testimony.

It is urged, among other grounds for reversal, that the verdict was excessive as the result of passion and prejudice, but we do not find that anything occurred during the progress of the trial that was calculated to prejudice the minds of the jury against appellant. We are,

however, of the opinion that the verdict was excessive, caused doubtless by the error in allowing the jury to speculate upon the question as to whether or not Wharton Bird's injury was permanent, and in allowing them to find that such injury was permanent.

As there is nothing to indicate that the verdict was rendered under the influence of passion and prejudice, the question as to whether or not the error in allowing the jury to consider permanent injury as an element of damage could have no other effect than to increase the amount of the damages assessed by the jury. The question of the permanency of the injury had no relation whatever to the issue of negligence. We are of the opinion therefore that the error indicated may be cured by allowing a remittitur to be entered for a sum sufficiently large to make sure that the amount for which the judgment is allowed will not be excessive and unreasonable.

In *St. Louis, I. M. & S. Ry. Co.* v. *Adams*, 74 Ark. 326, this court, through Mr. Justice Riddick, announced the doctrine in allowing a remittitur as follows: "What the court undertakes to do is simply to name an amount so low that there can be no reasonable ground to believe that a jury of average judgment, after considering the evidence, would, when properly instructed as to the law, allow plaintiff a less sum than that named, and which amount the court can clearly see is not excessive."

The facts set forth in this record would warrant the jury in finding that Wharton Bird, by reason of his injury, has been subjected to intense and horrible suffering up to the time of the trial, and that he would suffer in the future. There was testimony from which the jury might have found that the recovery of Wharton Bird would have been by slow process and would have taken considerable time. The testimony of his mother and father and the physicians, describing his condition during the eleven months since his injury, would warrant the jury in finding that it would require a considerable length of time for his recovery. In the opinion of some of the physicians who testified as experts Wharton Bird could be cured by proper treatment, showing that it

would require treatment in the future to cure him. Other experts testified, as we have shown, that it was uncertain as to whether he could be cured at all or not; but there was abundant evidence to show that for some time at least in the future the appellee would suffer greatly as the result of his affliction. While the uncontradicted testimony of the witnesses on behalf of appellee made it doubtful as to whether the injury to Wharton Bird was permanent and therefore rendered it improper to consider the injury as permanent, yet this testimony, as well as testimony on behalf of appellant, showed that there would be future suffering. It was therefore proper for the jury to consider future suffering as an element of damage, and under the evidence the question was correctly submitted in appellee's prayer No. 6*. Since the uncontroverted testimony showed there would be future suffering, the instruction was correct. Prior to the injury he was a stout, healthy child, free from nervous symptoms; after the injury he had lost weight. The nature of his sufferings since the injury was graphically described by his mother and father. Their testimony shows that since the accident he had "spells or spasms." They would come on "like having a spasm." They would leave him in from five to forty-five minutes. He had them at intervals of from three days to three weeks apart. When the spells came on him he made a "peculiar noise and his limbs would jerk and draw like a child in a spasm," and after the spells he seemed to be numb, and never went to sleep in the daytime.

We are of the opinion that under all the facts and circumstances a verdict in the sum of $5,000 would be a reasonable sum and the jury would have been clearly

---

*If you find for the plaintiff, you will find for him in such sum to which you find from a preponderance of the evidence the plaintiff is entitled. And in determining this amount you will compensate the plaintiff for all the pain and suffering endured by him which has resulted from said injury, or which shall thereafter result therefrom, if you find from a preponderance of the evidence that there will be pain and suffering therefrom in the future. You will also consider in arriving at the amount of your verdict, the effect of said injury on his nervous system, if you find the nervous system of said plaintiff has been impaired by reason of the said injury and the shock and fright incident and connected with the injury. You shall further consider the probable duration of the injury to the nervous system of the plaintiff, together with the probable effect in the future on the mental and physical condition of the plaintiff resulting from the impaired nervous system which may have been proven by a preponderence of the evidence, if any have been so proven.

justified in returning a verdict for that amount. The effect of the error we believe will be fully eliminated by a reduction of the judgment to that sum.

If the appellee will cause a remittitur to be entered in fifteen days for all in excess of $5,000 the judgment will be affirmed and judgment entered here for that sum; otherwise the judgment will be reversed and the cause remanded for a new trial.