St. Louis Southwestern Railway Company *v.* Overton.

## Opinion delivered July 6, 1914.

1. RAILROADS—INJURY TO PASSENGER ON FREIGHT TRAIN—DUTY OF CARE.—Although a passenger riding on a freight train is deemed to have assumed all the risks usually and reasonably incident to travel on such trains, yet when the railroad company undertakes the carriage of passengers on freight trains, it owes such passengers the same high degree of care to protect them from injury as if they were on passenger trains.

2. RAILROADS—INJURY TO PASSENGER ON FREIGHT TRAIN—DUTY OF CARE.—In an action for personal injuries received by a passenger on a freight train, the liability of the railroad must be determined in the light of the mode of conveyance, and the manner of the practical operation of the train. Liability depends upon whether or not the railroad company failed to exercise the degree of care which the law requires, towit, the highest degree of care which a prudent and cautious person would exercise under similar circumstances, to avoid the injury.

3. RAILROADS—INJURY TO PASSENGER ON FREIGHT TRAIN—LIABILITY.—A railroad company will be liable for an injury, caused by negligence, to a person who boards a caboose attached to a freight train, when the plaintiff entered, intending to become a passenger, and the employees in charge of the train permitted plaintiff to enter the car, although the same was not yet ready for the reception of passengers.

4. DAMAGES—PERSONAL INJURIES—FUTURE SUFFERING.—Where there is evidence that plaintiff, who was injured by the negligent acts of the employees of a railroad company, will have pain and suffering in the future, due to the injury, it is proper to submit the question of future pain and suffering to the jury, for their consideration in assessing damages.

5. DAMAGES—PERSONAL INJURIES—AMOUNT.—A verdict of one thousand dollars held not to be excessive under the evidence in an action against a railroad for damages due to negligence in causing a car in which plaintiff was a passenger to be jerked so that plaintiff sustained a painful injury to her head.

Appeal from Monroe Circuit Court; *Eugene Lankford*, Judge; affirmed.

STATEMENT BY THE COURT.

Pauline Overton, through her next friend and father, J. S. Overton, instituted this suit against the appellant for personal injuries. The facts, as they might have

been found by the jury, giving the evidence its strongest probative force in favor of the appellee, are substantially as follows:

On the morning of June 28, 1913, Mrs. Overton, the mother of Pauline, went with Pauline and other children to the station of Brinkley for the purpose of going on appellant's local freight train to visit her father, who lived on a farm about seven miles south of Brinkley, near Keevil. Appellant ran a daily mixed local freight and passenger train from Brinkley to other points along its line, including Keevil. The caboose or coach for passengers had been placed at or near the place where it usually stood when passengers took passage thereon. J. S. Overton and his wife and the children went into the coach which at the time was not connected with the engine and other portions of the train. The coach had seats running crosswise in the train similar to the seats in a regular passenger coach. The seats were cushioned, but at the top of the seats there was a strip of wood four or five inches in width. Overton was sitting facing north and his daughters, Pauline and Margaret, were also facing north. His wife was on the back seat, facing south. They had been thus seated in the car four or five minutes. He had purchased a ticket for his wife. He did not intend to go with them to Keevil. After they had been seated a little while two men passed through the coach and one of them asked if the Overtons had tickets. Overton replied that he had the ticket for his wife, but that he himself was not going, that he was just putting his wife and children on the train. About the time these men passed out of the car the engine backed into the coach. The jar threw Overton out of his seat and down on the floor in the aisle. It threw his wife into the seat where he had been sitting. It threw Pauline over backward and struck her head, cutting a place to the bone on the back of her head. Overton, at the time of the impact, had his baby in his arms and was trying to quiet it. When he first noticed Pauline after the jar she was sitting in her seat with her eyes closed. She sat that way

for quite a while, and then looked up and said, ''Papa, my head hurts me.'' The injury was back of the right ear. She had thick heavy hair and had on her straw hat.

Overton ran to the store and 'phoned to the doctor at Keevil, informing him that his wife and children were coming on the local. He then called Doctor McKnight, and they went in McKnight's car down to his wife's father's, where his wife and children had gone. When they arrived there Pauline was complaining of her head hurting her. The doctor forbade the parents bringing Pauline back home with them. She remained at her grandfather's until the following Monday. The injury occurred on Saturday before. Doctor McKnight brought her back in his car. He treated her five or six weeks. Prior to the accident she was in good health, and since then she had had chills and fevers, was very nervous, especially at night, frequently getting up at night crying, saying that some one was breaking into her room. She was always complaining of her head hurting her. Often at night she would wake up and go to her parents' bed, crying and screaming. These spells had continued up to a week before the trial. She never had such spells before the accident. The first three or four weeks after the accident she had spells of crying and screaming two or three times a week. After that the spells were less frequent, being sometimes two or three weeks apart. She had not grown or developed any since the accident. She was five and a half years old at the time of the accident. Since the accident she was not as rational as she used to be. Before the accident she appeared to be a very bright and active child, but after the injury she was very sluggish. When the other children were out at play she would drop her head and close her eyes like she was in a deep study about something. A younger playmate noticed that there was something wrong with Pauline. She was no longer the leader in their play as she was before the accident.

It was alleged in the complaint that the employees of the appellant negligently ran other cars upon the ca-

boose and suddenly stopped its train while going at a rapid speed, "all of which acts were done'with such force and violence as to knock plaintiff off her seat," causing the injury (which she describes) "to her damage in the sum of three thousand dollars."

The answer denied the negligence as alleged. It admitted that in the coupling of its cars plaintiff was knocked down, but denied that she was injured to the serious extent she claims. The answer also alleged that the injury was the result of the careless conduct of plaintiff's parents in permitting her to occupy a place where she could be injured by the coupling of the cars.

The employees of the appellant testified that the coupling at Brinkley at the time of the alleged accident was an ordinary coupling and such as is usually made by freight trains. They were backing up to make the coupling with two coal cars next the engine and some four or five freight cars next to the caboose. The employees did not know that Mrs. Overton and her three children were in the coach at the time the other cars were coupled onto it. The cars had automatic couplings. The witnesses did not notice any jar of the caboose. There was no occasion to make a severe coupling. It was not usual for couplings to be made with such force as to throw passengers from their seats. It was not safe for people to stand up in freight cars when couplings were being made.

The conductor testified that it was not the custom to allow passengers to get on the train until they were ready to start. He had notified passengers not to get on, but had not notified Mrs. Overton not to get on. The brakemen were making up the train, and there was no one to look out for passengers except the witness.

Among others, the court granted the following prayer at the request of appellee:

"(1) You are told that, while the plaintiff in taking passage upon a mixed train assumed the risk of necessary and usual jolts and jars, this did not relieve the railroad company from exercising the same high degree of care in the handling of its train as if she was riding

on a regular passenger train, to avoid injuring her. The risk of usual jolts and jars assumed by plaintiff is the risk incident to the mode of conveyance, and does not relax the rule as to the high degree of care to be exercised by the servants of the defendant to avoid injuring passengers. So in this case, if you believe that the plaintiff was without fault and would not have been injured if the defendant's servants had exercised such high degree of care, your verdict should be for the plaintiff.''

The appellant objected to the granting of the above prayer, and especially to the words, ''this did not relieve the railroad company from exercising the same high degree of care,'' and also the words, ''and does not relax the rule as to the high degree of care to be exercised by the servants of the defendant to avoid injuring passengers.'' The court overruled the objections, to which appellant duly excepted.

Appellant requested the following prayers for instructions:

''(3). If you find plaintiff, Pauline Overton, was injured from an unusual and extraordinary jerk or jar of the train while being coupled together at Brinkley, before you find for her you must find that she was a pas-. senger on that train, and that she or some one for her paid or offered to pay her fare from Brinkley to Keevil. The fact that her mother had a ticket would not entitle Pauline to ride with her, unless payment of her fare was made or tendered.

''(4). You are instructed that if you find from the evidence that the plaintiffs' boarded the caboose before the local freight train was made up and coupled together, and that neither the engineer nor the brakeman, clothed with the duty of coupling the train together, knew that plaintiffs or other passengers were aboard the train, and that it was not the custom at that point for passengers to board the train before it was coupled, the plaintiffs can not recover in this action for injuries resulting from the jars and jolts in the coupling of the train.''

The court refused the foregoing prayers, and appellant duly saved its exceptions.

The court granted the following prayer for instruction at plaintiff's request, to which appellant saved exceptions:

"(3). If you find for the plaintiff, you will, in assessing her damages, take into consideration the injury sustained by her and the physical and mental pain and anguish endured by her on account of the injury, together with such as she will necessarily endure in the future, resulting from her injury, if any, together with all other facts and circumstances in the case, and assess her damages at such sum as you believe from the evidence will fully compensate her for her injury."

There was a verdict in favor of the appellee in the sum of $1,000, and judgment was entered in her favor for that amount. Other facts stated in the opinion.

*S. H. West* and *J. C. Hawthorne,* for appellant.

1. Railway companies are only required to use such high degree of care in the handling of mixed trains as is consistent with practical and prudent conduct on the part of their employees. 52 Ark. 524; 57 Ark. 287; 60 Ark. 550; 55 Ark. 248.

2. Since the plaintiff, Pauline, had not paid fare, the only duty the appellant owed her was not to knowingly or wilfully injure her. Appellant was entitled to an instruction to the effect that before the plaintiff could recover the jury must find from the evidence that she was a passenger on the train and that she or some one for her had paid or offered to pay her fare, as requested in instruction 3. The court also erred in refusing to give instruction 4, requested by appellant. This court in numerous cases has held that a railway company is not liable for injuries to persons upon its cars without the knowledge of its employees. 45 Ark. 246; 49 Ark. 257; 50 Ark. 477; 57 Ark. 464; 58 Ark. 318; 90 Ark. 284.

3. The third instruction given at plaintiff's request was erroneous in authorizing the jury to assess damages for future suffering.

4. The verdict is shockingly excessive, in view of the testimony of two skilled physicians who examined the child in the presence of, and after consultation with, her attending physician, and stated that they found nothing abnormal about her, nor anything to indicate that she would suffer in the future; and in view of the manifest effort of her father and grandfather to magnify her injury as much as possible. 82 Ark. 61; 87 Ark. 111; 89 Ark. 9; 102 Ark. 499.

*Manning, Emerson & Morris,* for appellee.

1. The evidence shows that appellant was negligent, since it clearly shows that an unusual shock and jar resulted from the coupling.

The effort of appellant to show contributory negligence, by the statement that she was not tall enough to have received the injury had she been sitting in the seat, is not supported by any of the testimony. Moreover, it is not negligence *per se* to stand up in a mixed train. 95 Ark. 220-5.

2. Instruction 1, requested by appellee, is correct, as this court has heretofore declared. 94 Ark. 75-78. And the same opinion, page 78, approves instruction 3, on the measure of damages, objected to by appellant.

3. Instruction 3, requested by appellant, was properly refused. 98 Ark. 507-14.

Appellant's objection to the refusal to give instruction 4, requested by it, is fully answered by this court in *Kruse* v. *Railway Company,* 97 Ark. 137, 142; see also 95 Ark. 220.

4. The verdict is not excessive. 163 S. W. (Ark.) 1157; 86 Ark. 587; 88 Ark. 12; 90 Ark. 108; 67 Ark. 531.

WOOD, J., (after stating the facts). The appellant contends that the court erred in granting appellee's prayer for instruction No. 1. An instruction in this form was approved by this court in *Ark. S. W. Rd. Co.* v. *Wingfield,* 94 Ark. 75. In that case Mrs. Wingfield sued for personal injuries alleged to have been received by her from a sudden jar caused by the coupling of a mixed freight and passenger train on which she had taken her

seat as a passenger.  Two seats were turned facing each other in the coach which she entered and she and her husband sat in one of them.  While waiting in the yards the engine came back with such unusual force as to throw her forward against the seat in front and back against the seat in which she was sitting.  The essential facts upon which the instruction in that case and the one in this case are based are similar.  The court held in that case that the instruction was in accord with the law as announced by this court in *St. Louis, I. M. & S. Ry. Co. v. Brabbzson,* 87 Ark. 109, where we said: "It is well settled that, though a passenger riding on a freight train must be deemed to have assumed all the risks usually and reasonably incident to travel on such trains, yet, where the railroad company undertakes the carriage of passengers on freight trains, it owes such passengers the same high degree of care to protect them from injury as if they were on passenger trains."  And further: "But, as it is not practical to operate freight trains without occasional jars and jerks calculated to throw down careless and inexperienced passengers standing in the car, 'the duty of the company is therefore modified by the necessary difference between freight and passenger trains and the manner in which they must be operated; and, while the general rule that the highest practicable degree of care must be exercised to protect passengers holds good, the nature of the train and necessary difference in its mode of operation must be considered; and the company is bound to exercise only the highest degree of care that is usually and practically exercised and consistent with the operation of a train of that nature.'"

(1-2)    The instruction as a whole was not misleading and was in conformity with the law as announced in the above cases.  The first part of the instruction told the jury that the plaintiff, in taking passage upon a mixed train assumed the risk of the necessary and usual jolts and jars, and in the second paragraph the instruction informed the jury that the plaintiff assumed the risk of usual jolts and jars incident to the mode of conveyance.  The necessary

meaning of the court's charge was that the company owed to its passengers the same high degree of care in handling their train to avoid injury as it should exercise in handling a regular passenger train. In other words, the degree of care which the company owes the passenger to avoid injuring him is the same whether he be riding on a mixed freight and passenger train or on a regular passenger train. *St. Louis, I. M. & S. Ry. Co.* v. *Hartung,* 95 Ark. 220. But in determining whether or not the company has exercised that high degree of care which it owes its passengers the jury must take into consideration the difference in the modes of conveyance and the different methods employed in the operation of the trains; that degree of care which the company owes its passengers on either train is the highest degree of care which a prudent and cautious person can exercise reasonably consistent with these modes of conveyance and their practical operation. *Railway Co.* v. *Sweet,* 60 Ark. 550.

While the instruction is not happily worded, yet, when it is considered as a whole, and in connection with appellee's prayer No. 2,* and also appellant's prayer No. 2,† both of which were granted, the jury could not

*Appellee's prayer for instruction No. 2: (2) You are instructed that passengers riding on local freight trains assume the risk of the ordinary customary jerks and jars resulting from their being coupled together, incident to their starting and stopping.

†Appellant's prayer for instruction No. 2: (2) You are instructed that a passenger while riding upon a freight train assumes the risks and hazards that are incident to the operation of a freight train, yet, it is the general duty of the carrier to use due care for the safety of the passengers and a freight train carrying passengers can not be operated carelessly without subjecting the company to liability any more than a passenger train, and the operatives in charge of a freight train can not any more overlook the due care of their passengers than can the operatives of a passenger train, and, although plaintiff in this case was a passenger upon a freight train, yet, if you find from the evidence that defendant's operatives in charge of said train failed to use due care for plaintiff's safety or negligently or carelessly operated said train or moved the caboose connected therewith in which plaintiff was a passenger, and that by reason thereof she was injured, your verdict should be for the plaintiff.

have been misled, and there was no prejudicial error in granting the prayer in the form as presented.

(3) The difference in the particular modes of conveyance and in the manner of their practical operation are to be considered in determining whether or not the company is negligent in any given case; that is, whether or not it has failed to exercise the degree of care which the law requires, towit, the highest degree of care which a prudent and cautious person would exercise under similar circumstances to avoid injury.

There was no error in refusing appellant's prayers for instructions numbered 3 and 4. These were predicated upon the idea that there was testimony tending to warrant a finding that the appellee was not a passenger and entitled to the degree of care due a passenger at the time of her injury. The court was correct in refusing to submit to the jury to find whether or not appellee was a passenger on appellant's train at the time of her injury. The undisputed evidence showed that she went upon appellant's train for the purpose of taking passage thereon. The coach was standing at or near the place where it usually stood for the reception of passengers at the time appellee boarded the same. It was not her fault that she boarded it without the knowledge of appellant's employees. It was their duty to see that passengers did not enter upon the train before the same was made up and ready for passengers to enter thereon. The brakemen and the conductor were charged with this duty, and the conductor stated that he did not notify Mrs. Overton not to get on. He also stated that the brakemen were making up the train and there was no one to look out for the passengers except himself.

It thus appears that if the appellee was on the train before the proper time for her to take passage it was the fault of the appellant's employees, and appellant could not complain that appellee was not a passenger under these circumstances.

In *Kruse* v. *St. Louis, I. M. & S. Ry. Co.*, 97 Ark. 137, we said: "Since there is a statute compelling railroads

to carry passengers on local freight trains, when a person is permitted to enter a freight train as a passenger, there is no presumption arising that he is not a passenger.''

The conductor testified that ''the caboose was set in there for passengers.'' Under such circumstances the trainmen were bound to anticipate that passengers might go upon the coach. See *St. Louis, I. M. & S. Ry. Co.* v. *Hartung, supra.*

The appellant contends that the court erred in telling the jury that if they found for the plaintiff they should take into consideration, in assessing her damages, the pain and anguish that she will necessarily endure in the future, if any.

(4) There was testimony to warrant the jury in finding that there would be future pain and suffering to the appellee on account of the injury. The testimony on her behalf showed that at the time of the trial she was still suffering as the result of the injury. Her father, on this point, testified as follows: ''Since the accident we have had a great deal of trouble with her. She is very nervous, especially at nights. She is always complaining of her head hurting her. She is not as bright and active as she was. Very often she will wake up at night and come to our bed crying and screaming. She had one of those spells not over a week ago. She does not weigh as much now as before the injury.''

Her mother testified as follows: ''She is always complaining of suffering with her head. She is very nervous. At night she cries out in her sleep. She complains of being scared and wants to get in bed with us. She had always been a very strong, healthy child before the accident. She has not been well since, although she is some better now. She has these spells twice a week and sometimes oftener.''

Doctor McKnight, appellee's attending physician, testified that the injury caused her to be in the physical condition as detailed by her father and grandfather; that

it is probable that the injury will affect her for several years.

Doctor Gilbrech, after the condition of the child before and since the accident was set forth in a hypothetical question, stated: "It is possible that she would not recover for an indefinite period of time.'

The above testimony was sufficient to justify the court in submitting to the jury the issue as to whether or not appellee was entitled to damages for future pain and suffering. In *St. Louis, I. M. & S. Ry. Co.* v. *Bird,* 106 Ark. 177, we held "that where the evidence shows that the plaintiff will suffer considerable pain in the future the jury may consider future suffering in fixing the amount of damages." Submitting to the jury the issue of future suffering, where there is testimony to warrant that issue, is an entirely different matter from submitting the issue of damages as for a permanent injury where there is no testimony to show that the injury was permanent. See *St. Louis, I. M. & S. Ry. Co.* v. *Bird, supra.*

Here the instruction only submitted to the jury to find as to whether or not there would be future pain and suffering as the result of the injury. The court did not err in submitting that issue.

The verdict is not excessive. The testimony of the attending physician tended to show that the wound on appellee's head was a serious one. He says: "I found her suffering with a lacerated and contused wound on the back of her head that extended through the tissue and down to the bone. The wound was bleeding profusely and her clothes were bloody. She did not seem to be able to stand alone. She appeared to be dazed as if she had some concussion of the brain."

The doctor was asked a hypothetical question in which was stated the mental and physical condition of the appellee prior to the injury and also the condition which the evidence tended to prove she had been in since the injury, and he was asked what, in his opinion, "was the cause of that trouble?" and answered that "it was the

injury.'' He also stated that ''it was probable that the injury would affect her for several years, but that he could not say whether it would or not.''

Another physician was asked the following: ''If a child is not nervous up to the time of five years of age and then receives an injury that causes concussion of the brain and then is very nervous, would you say that the injury is the cause of it?'' and answered, ''Well, with those premises, I would have to say that the injury was the cause of the trouble.''

The physician who gave the above testimony was a witness on behalf of appellant.

True, physicians who were called in by consent of the parties to examine the appellee during the progress of the trial, and who were advised by the attending physician of the condition in which he found the little girl at the time of the injury, testified that they did not find anything wrong with the child except a small scar on the right side of her head; that if there were any injurious results from the wound they could not tell it from their examination. They reached their conclusion from what they saw of the child. They had never treated the child.

Another physician testified that he lived a short distance from appellee's home; that he had seen her playing in the street a few days after the accident, and saw her frequently playing with other children, and that he could not tell that there was anything the matter with her. He could not tell that there was any difference in the way she acted before and after the accident.

(5) The question for us is not what we would have found as the amount of damages to appellee had we been on the jury, but, giving the evidence its strongest probative force in favor of the appellee, was it sufficient to sustain the verdict. The jury might have found from the evidence that this child, who was a strong, bright and healthy child before the injury, had, by reason of the shock, suffered not only very serious bodily injury, but also an injury that had affected her mind as well. Her condition, as described by her parents and her grand-

father, shows that she, up to the time of the trial, had
endured great pain and suffering, and that such was
likely to continue for some time in the future. Her
physical health had been greatly impaired, and her mind
was also perceptibly affected. It was the province of
the jury to weigh this testimony, in connection with the
other evidence. They have accepted it, and we can not
say that the amount of the damages assessed by their
verdict as the result of the injury is excessive.

The judgment is affirmed.