Argued December 18, 1929; modified January 21, 1930

# RAYBURN FRINT *v.* C. AMATO

(284 Pac. 183)

For appellant there was a brief over the name of *Messrs. Senn & Recken* with an oral argument by *Mr. Frank S. Senn.*

For respondent there was a brief over the names of *Mr. Keith A. Caldwell* and *Mr. Ronald L. Reilly* with an oral argument by *Mr. Nicholas Jaureguy.*

HAMILTON, Acting J. The defendant assigns error as having been committed in the trial of said cause as follows:

Defendant, having been sworn as a witness in his own behalf, was asked the following question:

"You say you have been driving that truck on the streets of Portland how long?"

The question having been objected to as "incompetent, irrelevant and immaterial, and having no bearing on this case whatsoever," the court sustained said objection.

The defendant's counsel interrogated defendant, the driver of his car, as follows:

"Q. Do you know whether the Star car turned to the right or left before it hit you?

"A. He came right straight down. He didn't make any turn at all.

"Q. Did he make any turn at all—

"A. (interrupting) No, if he had just made a little swing, a little turn to the back, he would not have hit me."

Objection was made to this question, and motion made to strike the answer, which motion was allowed by the court. The sustaining of this motion is assigned as error number 2.

Another question was asked the defendant by said counsel as follows:

"Did you have any talk after the accident with Mr. Frint about him turning to the right or left?"

This question was objected to and the objection sustained. This action of the court is assigned as error number 3.

There was also an offer by defendant to show a statement made by the father of the plaintiff as to the weight of the car in which plaintiff was riding.

■ The argument is made as to assignments of error numbers 2 and 3, that the offer of proof is insufficient, and the said objections are not available to defendant on appeal. An examination of the record does not show what fact or facts appellant expected to elicit by the question or questions propounded to any of the witnesses named. It has from a very early

time in the judicial history of the state been an adopted rule of practice that to make an exception available under such circumstances the bill of exceptions should show what it is expected to prove by the answer to the question. In *Kelley v. Highfield,* 15 Or. 277, 293 (14 P. 744), the court adopts the general rule of law announced by the Indiana court in the case of *Graeter v. Williams,* 55 Ind. 461, which is as follows:

"But where a party, on the trial of a cause, has propounded a question to a witness with the view of eliciting evidence, to which question an objection has been sustained by the court, such party can not, by simply saving an exception to the decision of the court in sustaining such objection, get error into the record, which will be available to him in this court. In such a case, the party must go farther, and state to the court in which his cause is being tried, clearly and explicitly, what the evidence is which he offers to adduce and which he expects to elicit by the answer."

Subsequent to that decision this court, in the cases of *Booth-Kelly Lumber Co. v. Williams,* 95 Or. 476, 483 (188 P. 213), and *Bagley Co. v. International Harvester Co.,* 99 Or. 519 (195 P. 348), has adhered to this rule of practice.

■ It appears from the record that defendant did testify as to the length of time he had driven a truck, and also as to whether the driver of the other car in crossing the intersection, turned to the right or left. If there had been any error committed in sustaining the objection of plaintiff to the question asked of witness Charles Frint as to the weight of the trailer attached to his car, its effect, if any, was obviated by the evidence of said witness as follows:

"Q. How much did your Star automobile weigh?
"A. Well, it is listed at 1,780 pounds.

"Q. Tell us what articles you had in this trailer behind your touring car.

"A. The camp outfit.

"Q. And what did it consist of?

"A. A couple of light mattresses, camp stove, bed clothes and a few cooking utensils.

"Q. What else did you have?

"A. I had a few clothes; other than that there was nothing.

"Q. That was all there was in the cook—or the trailer, I should say, a light camp outfit and a few clothes?

"A. Yes, sir,"

and by the testimony of Otto Shumann as follows:

"Q. Did you have occasion to observe the trailer that was attached to the car?

"A. Yes, sir, I did.

"Q. Did you weigh it?

"A. No, I didn't have occasion to do that.

"Q. Did you have occasion to judge the weight of it? * * *

"A. Well, I would judge the weight of the trailer with the load that was on it approximately at 300 or 400 pounds; maybe 500 pounds, the most of it being bedding and camp outfit. It was light stuff."

■ The defendant excepted to the following instruction given the jury by the court:

"If you find that the defendant was guilty of negligence in any particular as specified in the complaint, and that without such negligence, if any, on the part of the defendant, the accident would not have occurred, the plaintiff would be entitled to recover for such damages as he suffered and sustained as a result of the accident, if any, even though the driver of the car in which the plaintiff was riding, may have been guilty of some negligence—if the accident would not have occurred without it."

This constitutes the defendant's sixth assignment of error. It is claimed that the court erred in its

charge whereby it relieved plaintiff from any liability with the driver and owner of the car for any negligence which might have been imputed to the driver arising out of the circumstances of the collision. This instruction was on the theory that plaintiff was an invited guest of the owner. The defendant concedes that were the status of plaintiff that of guest to the owner said instruction would have been correct and applicable. But in view of what is said in *Foster v. Farra,* 117 Or. 286 (243 P. 778), counsel contends that the relationship of father and son existing between the driver of the car in which plaintiff was riding and plaintiff renders the law as announced in said instruction inapplicable. The doctrine announced in that case is as follows:

"The rule adopted in several states is that one who keeps an automobile for the pleasure and convenience of himself and his family is liable for injuries caused by the negligent operation of the machine while it is being used for the pleasure or convenience of a member of his family. As to whether the son was engaged in the father's business, it is the rule, supported by the better weight of authority, that where a father provides an automobile for the purpose of furnishing members of his family with outdoor recreation, the use of the car for such purposes is within the scope of the father's business, analogously to the furnishing of food and clothing or ministering to their health."

It is not apparent that there is any analogy between the principles of law involved in the cause upon which said rule is founded and those in the instant cause. Our attention has not been called to any authority which sustains the view of counsel in that respect. The lower court, in giving the instruction complained of, was not in error.

■ By assignment of error number 9 appellant complains that the court failed to give the following requested instruction:

"It was the duty of the driver of the plaintiff's car to exercise ordinary care and it was the duty of plaintiff's driver to have his car under proper control and to keep a proper lookout for traffic, and for cars that might be turning into the cross streets, and if you find that he did not do this and as a proximate and sole result thereof this accident happened, then the plaintiff cannot recover and your verdict must be for the defendant."

But the court gave to the jury the following instruction:

"Now, with respect to the alleged negligence as set out in the answer with which the defendant charges the plaintiff, you are instructed that it was the duty of the driver of plaintiff's car to exercise ordinary care, and it was the duty of plaintiff's driver to have his car under proper control and to keep a proper lookout for traffic, and for cars that might be turning into the cross streets, and if you find that he did not do this, or failed to exercise ordinary care in any respect, or the care which an ordinarily careful and prudent person would have exercised under the circumstances, and that if such negligence, if any, on his part was the sole and proximate cause of the accident, then the plaintiff would not be entitled to recover and your verdict should be for the defendant."

This instruction is a clear and correct statement and not subject to criticism.

■ The defendant complains in his seventh assignment of error that the court erred in failing to give the following instruction requested by him:

"On the question of right of way at this place, I instruct you that if you find that the defendant, Mr. Amato, came to this intersection and made his turn

after giving his hand signal and had started on his turn before the plaintiff's car got to the intersection, then I instruct you that the defendant's car would have the right to proceed across the intersection into East 54th street, and it was the duty of the plaintiff's car to yield the right of way to the defendant."

The law governing under circumstances attending the approach by cars traveling in opposite directions at intersections of highways is as follows:

"Drivers when approaching highway intersections shall look out for and give right of way to vehicles on the right simultaneously approaching a given point, whether such vehicle first enter and reach the intersection or not." Laws of 1927, ch. 217, § 1, subd. 7(a).

In *Casto v. Hansen et al.*, 123 Or. 24 (261 P. 428), Mr. Justice BELT, in speaking of the question of law presented, says, of one who would avail himself of this statute:

"His conduct in this respect must be measured by the degree of care which an ordinarily prudent person would have exercised under the same circumstances. The law cannot establish any arbitrary standard in such matters."

Again, on page 25 of the opinion, the court adopted what has been said on that subject in *Ward v. Clark*, 232 N. Y. 195 (133 N. E. 443), which reads as follows:

"The privilege thus conferred (speaking of such right of way) is not inflexible and absolute. A right of way, like a burden of proof, will establish precedence when rights might otherwise be balanced. It helps us little when without it the balance would be unequal. A right of way might turn the scales if, when the plaintiff started to cross, the cars had been equidistant, or nearly so, from the point of collision, due regard being had also for the speed of their approach. Even with the distances what they were, it was an element which the triers of the facts were to consider in their estimate of conduct."

And the following from this opinion (*Casto v. Hansen,* supra,) is applicable, and aptly expresses the rule of law:

"The right of precedence at an intersection of two highways given by law has no proper application except where the travelers or vehicles on the intersecting highways approach the crossing so nearly at the same time and at such rates of speed that if both proceeded, each without regard to the other, a collision or interference between them is to be reasonably apprehended. In such case it is the right of the one having the precedence to continue his course, and it is the duty of the other to yield to him the right of way. But if a traveler not having such right of precedence comes to the crossing and finds no one approaching it upon the other highway within such distance as to reasonably indicate danger of interference or collision, he is under no obligation to stop or to wait, but may proceed to use such crossing as a matter of right."

See, also, *Stryker v. Hastie* (Or.), decided December 10, 1929.

Appellant's assignment of error number 8 is substantially as the one just referred to.

The said instructions so requested are each obnoxious to the terms of the Code in the particulars referred to, and also to the interpretation thereof given by the court in *Casto v. Hansen,* supra. There was not error committed by the lower court in their refusal.

■ In defendant's assignment of error number 5 it is alleged that the court erred in not allowing the following motion of defendant:

"Comes now the defendant and moves the court for an order discharging the jury and declaring this case a mistrial on the ground and for the reason that in the Evening Journal of May 20, 1929, and the Oregonian of May 21, 1929, while this case was on trial,

and during the trial, it was published in said papers that this was the second trial of this case; that the first case was declared a mistrial because of the inadvertent introduction of evidence regarding the presence of insurance in the case, and in view of this fact it brings knowledge, in all probability, to the jury that the defendant is protected by insurance, all of which prevents the defendant from having a fair trial.''

As set forth by counsel for defendant this motion is based on the fact that the said article did appear in the press. There is no showing made to the effect that any of the jurors sitting in the trial of the cause had seen the articles or either of them or that they or any of them had any knowledge thereof. In a word it was asked that a mistrial be declared for the reason that the newspaper articles had been published.

In the case of *People v. Feld,* 149 Cal. 464 (86 P. 1100), it is stated:

''It, however, devolves upon the party moving for a new trial on this ground (the publication of newspaper articles during progress of trial) to show that such articles have come to the knowledge of the jurors, for, unless they have, prejudice could not possibly have resulted to the defendant by reason of the publication, and the burden is on him to show any substantial cause that may exist for the granting of a new trial. It cannot be held that evidence showing the publication of articles in newspapers during a trial raises any presumption that such articles have come to the knowledge of the jurors. It is their duty to abstain from reading any articles relative to the case they are trying, and from talking to any one or allowing any one to talk to them concerning the case, and to refrain from allowing themselves to receive any information or impression concerning the case from any source other than the evidence, arguments, and instructions given in open court, and the presumption is that they have fully performed their duty.''

It is evident from the record that the court ruled correctly in denying the said motion of defendant.

■ There are no other assignments of error requiring special attention except defendant's eleventh, which will be presently considered. In this, defendant alleges that the court erred in refusing to give to the jury the following requested instructions:

"I instruct you as a matter of law that the plaintiff cannot recover any damages for permanent injuries, for the reason that there is no competent medical testimony in this case to the effect that he has suffered permanent injuries.

The following is a resume of the evidence introduced at the trial, so far as showing the injuries suffered by plaintiff and as to whether they were of a permanent nature:

Rayburn Frint, plaintiff, being sworn, testified as follows:

"Q. And do you remember the cars hitting?
"A. Yes.
"Q. And then what happened?
"A. Well, I fell out on the street car track.
"Q. Do you remember anything after that?
"A. No.
"Q. What is or was the next thing you remember?
"A. That they picked me up.
"Q. Where did they take you?
"A. In an ambulance.
"Q. And where did they take you after you were put in the ambulance?
"A. To the hospital.
"Q. How long were you in the hospital?
"A. Two weeks and one day.
"Q. And did you have any trouble when you were in the hospital—were you hurt?
"A. No, very little.
"Q. Well, did you have any headaches while you were there?
"A. Yes, sir.

"Q. Just show these people what part of your head ached while you were in the hospital, point to it.

"A. Right here (illustrating).

"Q. How often would you have these headaches when you were in the hospital? Would they be pretty often, or a long way apart?

"A. Very often.

"Q. Would they be as often as once a day?

"A. Yes, every once in a while."

In answer to a question as to whether he ever had any trouble in reading before this accident the witness testified, "Some words, is all," and that he can not read like he could before the accident. He says that when he reads a page and a half or two pages the words jump all over the page and that he has to stop reading; that he has this trouble about every time he reads; that he is still troubled with headaches and that he has them every afternoon after school.

Mrs. Catherine Frint, the mother, testified that since Rayburn came out of the hospital he has not been able to see as before, that his vision is not clear like it was before. She says he complains that the letters jump around and he can not tell one letter from another; that he can not read more than two pages before he has trouble; that he did not have the condition before the accident; that it is now difficult to interest him in anything, and that he is fidgety and nervous. She also says that he now seems dull, and before the accident he was alert and interested in everything.

Dr. Fred J. Ziegler, a witness for plaintiff, testified that he had occasion to attend Rayburn Frint in August when he was brought into the hospital as result of an accident. He says when brought to the hospital he did not think that the boy was conscious of what was going on—a sort of comatose condition; that the boy

had an injury to his head and a bruise on the right side of his head near the ear and also had some bleeding from his left ear and a fractured skull. He testified that he took X ray pictures, from one of which, a picture of the boy's skull, he found a fracture, and found blood coming from the ear and he was rather delirious, which would indicate that he had some injury to his brain.

Dr. August B. Dykman, a witness for plaintiff, testified, in substance, that he is a physician and surgeon, and specializes in treating the eye; that he examined Rayburn Frint, the examination consisting of a test to determine his vision and the functioning of the eyes and the condition of his eyes as well. He found "the vision of each eye perfectly normal; the use of the two eyes, when the eyes were more or less at rest looking constantly, the two eyes came within range of normal. There was no evidence inside of either eye that the eyes themselves were injured. He had, in the reading test, or testing his vision for reading, he had when he was reading with both eyes open—the eyes usually quickly fatigued, and he had a double vision that occurred after he had been reading a short while, the two eyes together. With each eye alone he was able to read normally." The doctor was asked the following question:

"Q. What is the nature of double vision?
"A. Double vision is a condition in which the visual line of each eye does not describe corresponding points on the retina of each eye. In other words, one eye is not in the same direction as the other eye when looking at an object; either turned in or out.

"Q. Assuming that it has been testified here, or rather that on the 18th day of August, 1928, Rayburn Frint was thrown from an automobile on the street car track and received a fracture of the skull from

which he was rendered unconscious for a time and confined in the hospital for approximately 15 days, and ever since that time his eyes have bothered him to the extent that when he reads a short time he sees double—in your opinion would a fracture to the skull have any effect on the eyesight?

"A. I assume you mean the use of his eyes?

"Q. Yes; I mean the use of his eyes.

"A. Yes, it could have an effect on the use of his eyes.

"Q. And would that be an injury to the nerves, or what, if anything?

"A. As a rule, yes, it is a nerve injury."

The doctor further testified that whether this condition came from the fracture he did not know; that those things come from many causes, and that sometimes the trouble may be corrected with glasses.

Dr. W. H. Buermann was called as a witness for plaintiff and testified substantially as follows: That he specializes in general surgery; that he gave Rayburn Frint a general examination involving the head, cursory examination of eyes, hearing, an examination of his chest and testing his reflexes, and the usual routine examination of the rest of his body. He testified that the responses he received showed that the boy was not unusually nervous, and were about that of a normal boy of his age.

Dr. Ziegler, upon being recalled, testified as follows:

"Q. By Mr. Senn: I understand you have the pictures (referring to X rays) taken from different positions so that if there was any fracture you would have found them?

"A. Yes, sir.

"Q. As I understand they show a faint line fracture an inch and a half long?

"A. Yes, sir.

"Q. And that is the only fracture you can find?

"A. Yes, sir.

"Q. You say that he was somewhat delirious for about 48 hours, and after that he cleared up?

"A. Yes, sir, he cleared up.

"Q. Did he show any untoward symptoms from this fracture?

"A. Afterwards he recovered rapidly; after the tenth day he was up in a wheel chair.

"Q. And I understand in two weeks and one day you sent him home?

"A. I think he went home on the 2d of September, and he went in on the 18th of August, I believe.

"Q. When you sent him home he had practically recovered?

"A. Yes, as far as direct symptoms; the head injury, yes, but he was not strong and not in a normal condition.

"Q. Were there any symptoms of permanent injury from this fracture?

"A. Not that I know of."

It will be seen from the evidence that the questions of fact before the jury relative to the alleged injuries received by the plaintiff were those pertaining to the shock, bruises and injuries sustained by him at the time of the accident, and the consequent injury of impaired vision. It is also claimed that there is an impairment of the nervous system about which evidence was given, symptoms of which are found in frequent headaches, lack of interest in things, and other actions evidence of which is in the record. However, a careful examination of the evidence does not indicate that there is any which may be said to show that any of the claimed resulting injuries are permanent in their nature. On the contrary, the affirmative evidence on that subject is to the effect that said injuries are not permanent in character.

The rule of law applicable is that "if, from the testimony, it can be said there is a reasonable probability of an injury being permanent, then the question may properly be submitted to the jury": *Madden v. Columbia & Nehalem River R. R.*, 101 Or. 569 (200 P. 1038). In that case the court approved the rule as stated by the supreme court of Texas in *Galveston Ry. Co. v. Powers,* 101 Tex. 161, 164,. in the following language:

"Neither expert witnesses nor the jurors may be turned loose in the domain of conjecture as to what may. by possibility ensue from a given statement of facts. The witness must be confined to those which are reasonably probable, and the verdict must be based upon evidence that shows with reasonable probability . that the injury will produce a given effect."

. See, also *Young v. Mandis,* 191 Iowa 1328; *St. Louis I. M. & S. Ry. Co. v. Bird,* 106 Ark. 177; *Jones v. Sechtem,* 131 Okla. 155; *Shuck v. Keefe,* 218 N. W. (Iowa) 31; *Gallagher v. Philadelphia Rapid Transit Co.,* 248 Pa. St. 304. In *St. Louis I. M. & S. Ry. Co. v. Bird,* supra, the court says:

"The experts on behalf of appellee did not testify that in their opinion the injury to Wharton Bird was permanent. It was a matter of speculation with them as to whether it was permanent or not. This being true, it must also have been only a matter of conjecture with the jury. But to fulfill the requirements of the law there must be affirmative testimony to the effect that the injury was permanent before the jury would be authorized to find that such was the fact, and the court should not allow the permanency of the injury to be considered as an element of damage where the witnesses themselves are uncertain as to whether there would be any permanent injury and where the nature of the injury *per se* does not show that the injury was permanent."

The record in this cause shows substantially a trial of the cause free from error, except in the failure to give to the jury the instruction last referred to, and to which we have last given attention. Under the evidence submitted in the cause, we are constrained to hold that defendant was entitled to such instruction. We believe, however, that the principles announced by Mr. Justice MCBRIDE *in Hoag v. Washington-Oregon Corp.*, 75 Or. 609 (147 P. 756), indicate that this cause, under the circumstances attending it, should be finally determined by this court and not remanded to the lower court for retrial. For this reason, we are reluctant to remand the cause for retrial.

■ The court, through the record in this case, is very familiar with the injuries suffered by plaintiff arising from the accident as narrated in his complaint. After careful consideration of the question of the amount of damages plaintiff should recover, the court adjudges to him the sum of six thousand ($6,000) dollars, and awards him a judgment against defendant for the said amount.

It is ordered that defendant recover his costs incurred on this appeal.                    MODIFIED.

COSHOW, C. J., and BEAN and BELT, JJ., concur.