MARBURY et ux. v. ILLINOIS CENT. R. CO. et al.

ILLINOIS CENT. R. CO. et al. v. MARBURY et ux.

(Circuit Court of Appeals, Sixth Circuit. January 5, 1910.)

Nos. 1,965, 1,966.

CARRIERS (§ 320*)—INJURIES TO PASSENGER—QUESTION FOR JURY.

    Plaintiff, who was recovering from a severe illness, by advice of her physician went in January from Memphis to New Orleans, traveling on the railroad of one of the defendants, and riding in a sleeping car of the other defendant. The weather at Memphis was very cold, with ice and

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

snow on the ground. The car was not heated until four hours after leaving Memphis, although defendants were advised of plaintiff's condition, and she suffered continuously from cold during that time. The second day after reaching New Orleans she suffered a relapse, and was again very ill for several months. In an action against defendants for negligence, on the question of damages, physicians were called as experts, and, while admitting that the relapse and subsequent illness might possibly have been due in whole or part to exposure in going to and from the stations and the fatigue of the journey, they without exception expressed the opinion that the far more probable cause was the continued exposure to cold in the car. *Held,* that such evidence was sufficient to require the submission of the question to the jury.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 320.*]

In Error to the Circuit Court of the United States for the Western District of Tennessee.

Action by C. C. Marbury and Mrs. C. C. Marbury against the Illinois Central Railroad Company and the Pullman Company. Judgment for plaintiffs, and both parties bring error. Reversed on plaintiffs' writ of error.

This suit was brought in the circuit court of Shelby county, Tenn., by William Messick and Mrs. Mary Messick, his wife, against the Illinois Central Railroad and the Pullman Company, to recover damages for alleged negligence. On petition of defendants the case was removed to the court below.

It was stated in the declaration in substance that on January 7, 1905, Mrs. Messick was a passenger in a sleeping car of the Pullman Company on one of the trains of the railroad company, from Memphis to New Orleans; that the weather was extremely cold, and the sleeping car was allowed to be and remain unheated for several hours and until the train reached Grenada, Miss.; that Mrs. Messick was in a delicate condition, recovering from a severe illness of several months, and this information was given to the defendants at the time plaintiff boarded the car; that Mrs. Messick suffered a relapse, which permanently affected her health and wrecked her nervous system. To this declaration the defendants each filed a plea of not guilty.

William Messick died, and the suit was revived in the name of his widow. Subsequently Mrs. Messick married C. C. Marbury, and thereupon an order was entered by the court that the case be prosecuted in the name of C. C. Marbury and Mary Marbury. The case brought here was the result of a second trial; a verdict being rendered in favor of plaintiffs against both defendants for $750. Plaintiffs for themselves and the defendants have each prosecuted error to this court.

John E. Bell, for plaintiffs.
Albert H. Biggs, for defendant Illinois Cent. R. Co.
Thos. H. Jackson, for defendant Pullman Co.

Before LURTON, SEVERENS, and WARRINGTON, Circuit Judges.

WARRINGTON, Circuit Judge (after stating the facts as above). So far as Mrs. Marbury is concerned, the complaint is that the court in its charge to the jury erred in limiting recovery to such damages as a person in average health would suffer, without resulting sickness, inconvenience, or injury, from riding for several hours on a cold day in a sleeping car which was not supplied with heat, and in withdrawing from the jury all evidence relating to plaintiff's real condition and to damages resulting from her subsequent relapse and sickness.

The reason for so limiting recovery is not in terms stated in the charge of the court. The reason urged at the time by counsel for the railroad and Pullman companies in support of motions to direct a verdict was that the proofs did not connect defendants' breach of duty with plaintiff's subsequent relapse. It is still insisted that the proof fails in this regard, because it does not show certainly that the cold in the car caused the relapse; and, on the contrary, it is said that other causes for which defendants were not liable may have brought on the relapse. From this it is argued that the cause of plaintiff's relapse is merely conjectural, and consequently that the jury was not entitled to speculate as to the real cause.

In attempting to show that the condition of the sleeping car was the cause of plaintiff's relapse and sickness, testimony of physicians was offered and received. But the court subsequently withdrew this testimony from the consideration of the jury. There was no claim that the cause of relapse was not a proper subject for expert testimony. Nor was it suggested that the physicians were not competent as experts. It is likewise to be noticed that no denial is made in argument of the impaired physical condition of plaintiff when she entered the car, or of the fact that she suffered a relapse and severe illness some days subsequently to her exposure to cold in the car. Moreover (apart from a claim of the Pullman Company that it was not shown that it owned the sleeping car), the position taken by the companies amounts to an admission that they were guilty of neglect in failing to heat the car. The present inquiry is therefore reducible to this: Whether the whole proof as originally received was sufficient prima facie to connect defendants' breach of duty with plaintiff's subsequent relapse and sickness.

We shall speak of Mrs. Marbury as Mrs. Messick, for she is called by the latter name in the record. It appears that Mrs. Messick suffered a miscarriage in September, 1904, and that this was attended by pelvic inflammation, including inflammation of the ovaries and Fallopian tubes, as well as of the peritoneum covering those organs; the technical name of the disease being salpengitis. She suffered with the disease through October and November; her life being despaired of for a few days. She apparently improved in December, and, as she says, "commenced getting better and better and better" until Christmas. She then moved about the rooms in which she and her husband (who was also ill) were confined until January 7, 1905. On that day, under the advice of her physician, she and her husband, with their children and a nurse, went from Memphis to New Orleans over the Illinois Central Railroad, to remain for a time at the home in New Orleans of Mrs. Messick's mother. She was not off of the floor of the rooms before mentioned between the commencement of her illness and the time of starting for New Orleans. She walked down the stairs of her home and then for a distance of some 30 or 40 feet to a carriage, and upon arrival at the railroad station she was taken in a wheeled chair to a restaurant in the station, where she waited with friends until the train arrived. She was taken thence in the chair to the steps of the sleeping car. She then walked into the car and to the drawing room.

It will conduce to clearness later briefly to refer to Mrs. Messick's

exposure to cold. The weather was cold at Memphis, the thermometer ranging from 23 degrees above zero in the morning to 31 at 12 o'clock noon, 32 at 3 o'clock, and 31 at 4 and 8 o'clock; the ground being covered with ice and snow. The sleeping car was not heated when Mrs. Messick and her family boarded it, and it was suffered to remain in that condition for about four hours. At Grenada, Miss., after some trouble, if not repair, the heat was turned on. Requests were repeatedly made of the conductor and porter to have the heat turned on, but though frequently promised it was not done until the time mentioned. Meanwhile Mrs. Messick reclined on the lounge. The car was comfortable on the trip from Grenada to New Orleans. Upon arrival in that city, Mrs. Messick walked from the car to a carriage, and was taken thence to the home of her mother, where she walked from the carriage into the residence. ' She there suffered a relapse, and a long and continued illness.

The difficulty of the present question begins here, for there is no dispute of moment in the testimony thus far. Was the relapse traceable proximately to the cold in the car? If so, liability does not seem to be seriously controverted. Or, on the other hand, was the relapse traceable to exposure in going to the car, or to the excitement and natural fatigue of the trip? Or were all these causes so blended as to prevent identifying any cause for which defendants were liable? These and kindred questions are found throughout the testimony of the physicians, and they resulted in introducing into the case much confusion.

This confusion may, we think, be fairly cleared away by giving attention to what we conceive to be the preponderance of testimony concerning Mrs. Messick's trip from her home to the sleeping car at Memphis, and from the sleeping car at New Orleans to the home of her mother in that city. The short distance she walked between the room of her home and the carriage, and the comparatively short time she was in the carriage in going to the station, and then in the wheeled chair to the restaurant of the depot, do not, from the testimony, appear in point of time or of exertion to have caused excitement, fatigue, or exposure of consequence. The restaurant was on the level of the street approach and the railroad tracks, while the waiting room was on the floor above. The restaurant was comfortably warm, and Mrs. Messick was cheerful while waiting there an hour for the train. She was then removed in the wheeled chair to the steps of the sleeping car, and the exertion required to walk into the car and to the drawing room could not have been as great as that involved in walking from her room to the carriage. It is true the attention of one of the witnesses was called to the fact that in her former testimony she had said that Mrs. Messick appeared exhausted when she reached the drawing room; but the explanation of the witness seems to remove that impression. The same general result may be stated respecting Mrs. Messick's leaving the car and going to her mother's home in New Orleans, although the distance between the station and her mother's home in that city was about two miles. We do not discover any claim that the weather was cold in New Orleans; nor do we recall any evidence tending to show that there was any more occasion for fatigue in riding from the sleeping car to the home of her mother in that city than

there was in riding from her own home to the sleeping car in Memphis. Dr. Maury, one of her attending physicians in Memphis, testified:

"Q. Who, if any one, advised that the trip would be safe? A. I did. Q. Doctor, if she had taken that trip well cared for until she was placed into a sleeping car, in the drawing room of the car, and the car had been properly heated and provided, would the trip have been a dangerous one? A. I don't think so, at the time."

It is therefore hard to see how the testimony supports the hypotheses and consequent answers relating to exposure, fatigue, or excitement during the portions of her trip between residences and stations.

Turning now to the plaintiff's experience in the car and her subsequent condition, she stated that she was "extremely cold, and I had to use all the wraps I could possibly get, and take a great deal of whisky to keep up any warmth at all"; and she said she "was comfortable when the heat was turned on." She stated that within a week she had grown so ill that she was compelled to take her bed "because of constantly increasing suffering." In her cross-examination this was said:

"Q. When did you first begin to suffer pains indicating a relapse to your former troubles, which you had in Memphis? A. About the second day after I arrived."

She further stated that it was nine days before she called a doctor.

It is true as claimed that in answer to a hypothetical question put to Dr. Maury, which concluded with the inquiry "whether the relapse was caused by the cold condition of the car," he stated that he "could not express an opinion as to whether the relapse was due to any exposure in this particular case." When asked whether such exposure would be "apt to cause a relapse," he answered:

"Yes; it would."

Later, he said:

"If the symptoms of relapse occurred in a day or two after the exposure, I would think it would be very probably the cause of it."

Mrs. Messick testified that this occurred, as above pointed out.

Dr. Turner, in answer to a question closing with the inquiry as to the effect of exposure to cold in the car, said:

"I should expect such symptoms as she had suffered from before to be lighted up again, or any that still existed in her convalescence to be aggravated."

Dr. Leroy was questioned by the court and answered thus:

"Q. State whether or not, if a relapse came to this woman in New Orleans, it might or might not be attributable either to the exercise incident in getting from the bed down the steps into the carriage, driving to the railroad at Memphis and waiting for the train, and getting into the car, and the exercise and weariness from the trip, independent of any cold to which she was exposed in the car and the exercise of getting out of the car into the carriage and driving several miles and going into the house, whether or not that might be attributed to the exercise and fatigue incident to the exposure and independent of any cold in the car? A. Such a thing would be within the bounds of possibility, but in the presence of two causes, one of which to me is so much more manifest, especially with a woman who has been up a couple of weeks, I would be inclined to disregard one for the much more manifest cause.

"The Court: It would be in your opinion that it was more likely to have occurred from the exposure in the cold car than the other? A. Unquestionably so.

"The Court: But it might be attributed and might have been produced by the other? A. Such a thing is within the bounds of possibility."

"The Court: Then it might be attributable to both? A. Both; the trip might contribute something. Of course, if it is within the bounds of possibility, we could not exclude one; if we admit one we must admit them both, I think."

Dr. Holt, who attended Mrs. Messick in New Orleans from January 16, 1905, to the following May 17th, testified in relation to her trip in the sleeping car that "such exposure under the protracted influence of cold is precisely that which would most likely re-awaken inflammation and bring on a relapse"; "that her relapse dated from her long exposure on the train"; that her condition "was exactly such a condition as would follow such a cause"; also, answering a question whether she would have recovered if the trip had been a comfortable one:

"I do mean to state for the reason that the simple fact of traveling from Memphis to New Orleans, under comfortable conditions, would not have been the exciting cause of the renewed inflammation, within the range of reasonable probability."

Is it correct to say as a conclusion of law that this testimony in its trend and tendency has no weight or value? Is it not to be considered at all, especially under appropriate instructions and in connection with the facts and circumstances of the whole case? In the classifications made of decisions by Mr. Rogers, both in criticism and support of opinion evidence, it is said in his work on Expert Testimony (section 203):

"On the other hand, many cases may be found in which courts have expressed the opinion that the testimony of experts in medical science is of great value, or entitled to great weight."

It is true, cases cited in that work (like many of the decisions, federal and state, collected in 5 Enc. of Ev. 637 et seq., tit. "Weight of Expert Testimony," note 21) show, and we agree, that discrimination in subjects must be exercised in attaching material weight to opinions of medical experts, as also and especially of some other classes of experts. But it is only fair to say that the present physicians appear to have been regarded by counsel for both sides as exceptionally well qualified, and also as candid and frank. No witnesses were called by defendants. Upon the question, then, of whether there was any evidence meriting submission to the jury touching the cause of relapse, we think we may safely treat the testimony of these physicians the same as we should testimony concerning ordinary facts.

It was to be expected of such men that they would not state with absolute certainty that Mrs. Messick's relapse could not have been due to exposure or fatigue occasioned by the journeys between the two residences and stations of Memphis and New Orleans. They admitted these as possible causes; but their testimony in effect shows that there was no cause attending these journeys which seems comparable to the cause arising from the condition of the sleeping car.

There is a class of decisions in which medical opinion is relied on to

show cause of bodily affection, even though it cannot be shown with certainty. Illustration may be found in Matteson v. N. Y. Central R. R. Co., 35 N. Y. 487, 490, 91 Am. Dec. 67, where it appeared that plaintiff's wife was suffering from spinal affection claimed to be due to injury received on defendant's road. The court said:

"\* \* \* It was impossible to prove, by direct evidence, and with absolute certainty, from what cause the affection proceeded. Something was necessarily left to inference; not a merely speculative, but a rational, inference, based upon all the circumstances of the case."

True, evidence was offered in that case tending to eliminate causes other than the one complained of, but that is true of the present case. The difference between the two cases in this regard could at most be only of immaterial degree.

In McCafferty v. Pennsylvania Railroad, 193 Pa. 339, 344, 345, 44 Atl. 435, 74 Am. St. Rep. 690, when speaking of the difficulty in that case of showing connection between the accident and the death of the person claimed to be negligently injured, the court said:

"The connection between the accident and the death was not clearly established. The deceased was injured by the derailment of the car in which he was riding on April 1, 1896. He lived until April 12, 1897, and the immediate cause of his death was an abscess on the liver. A month before he died he had a severe attack of grippe. It was incumbent upon the plaintiff to show with reasonable certainty that the abscess was caused by the injury received. This it was difficult to do, as the disease is one whose origin is difficult to trace. The medical testimony produced by the plaintiff was in itself far from convincing; but it was fortified by proof that her son had never recovered from the effects of his injuries, and that they were apparently internal, and indicated a serious derangement of the liver before he had the grippe. We are not prepared to say that the court should have instructed the jury that the testimony did not warrant the conclusion that the death was the natural and proximate consequence of the accident. The question, however, was one which should be submitted with most careful instructions."

See, also, Beauchamp v. Saginaw Mining Co., 50 Mich. 163, 172, 173, 15 N. W. 65, 45 Am. Rep. 30; Baltimore City Pass. Railway Co. v. Kemp and Wife, 61 Md. 74, 80; Bishop v. St. Paul City Ry. Co., 48 Minn. 26, 33, 50 N. W. 927; Denver & R. G. R. Co. v. Roller, 100 Fed. 738, 752, 49 L. R. A. 77;[1] Taft v. Brooklyn Heights R. Co., 14 Misc. Rep. 390, 35 N. Y. Supp. 1042; Harvey v. Fargo, 99 App. Div. 599, 91 N. Y. Supp. 84.

There can be no difference in principle between the competency of opinion evidence which ascribes cause of disease and that which minimizes or altogether eliminates cause; or, in other words, the trained mind must be capable of differentiating causes reasonably certain in their effect from those of no importance or probable effect.

We are thus led to believe that the present case is not like that of Patton v. Texas & Pacific Ry. Co., 179 U. S. 658, 21 Sup. Ct. 275, 45 L. Ed. 361, or the class of kindred cases which are so much relied on by learned counsel for defendants. There is not the uncertainty of cause in the present case that was found to exist in the Patton Case. The source of relapse seems to us to be traceable with reasonable certainty. At least, upon all the evidence pertinent to the issue touching result of cold in the sleeping car, it would not be safe to conclude as matter of law that "fair-minded men" may not, without guessing as

[1] 41 C. C. A. 22.

to cause of relapse, "honestly draw different conclusions." The present case would seem therefore to be ruled by the settled principle affirmed by Mr. Justice Brewer in Richmond & Danville Rd. Co. v. Powers, 149 U. S. 43, 45, 13 Sup. Ct. 748, 37 L. Ed. 642, and referred to by him in the Patton Case. Furthermore, in Mt. Adams & E. P. Inclined Ry. Co. v. Lowery, 74 Fed. 463, 477, 20 C. C. A. 596, 609, Judge Lurton, in stating the difference between the functions of the trial judge in granting a motion for a new trial and in passing upon a motion to direct a verdict, said:

"In the latter case we think he cannot properly undertake to weigh the evidence. His duty is to take that view of the evidence most favorable to the party against whom it is moved to direct a verdict, and from that evidence, and the inferences reasonably and justifiably to be drawn therefrom, determine whether or not, under the law a verdict might be found for the party having the onus."

And in the recent case of G. Rochford, etc., v. Pennsylvania Co., 174 Fed. 81, 84, the same learned judge, speaking for the court, said:

"If the plaintiff has produced material evidence, sufficient, if believed and uncontradicted, to warrant a verdict, no amount of contradictory evidence will authorize the trial judge to take the question of its effect and weight away from the jury."

We are constrained to hold that the court erred in withdrawing the evidence mentioned from the jury, and that the judgment in favor of the plaintiffs below must be reversed and a new trial awarded for that reason. It follows that the assignments of error presented by the defendants below must fall with the judgment of which they complain. The costs of both proceedings in error in this court will be paid by defendants.