Argued February 15, reversed and remanded June 6, 1950

# HENDERSON *v.* UNION PACIFIC RAILROAD COMPANY

### 219 P. (2d) 170

146

In Banc.

*Arthur M. Dibble* and *Leo Levenson,* of Portland, argued the cause for Respondent. With Arthur M. Dibble on the brief were Samuel Jacobson and Goodman & Levenson, of Portland.

*Randall B. Kester* and *Howard K. Beebe,* of Portland, argued the cause for Appellant. With them on the brief were Maguire, Shields, Morrison & Bailey, of Portland.

LUSK, C. J.

The defendant, Union Pacific Railroad Company, has appealed from a judgment for the plaintiff in an action for personal injuries brought under the Federal Employers' Liability Act.

The plaintiff claimed in his pleadings and by his testimony that he suffered the amputation of his left leg below the knee as the result of the negligence of the defendant. His evidence is to the effect that on May 17, 1946, while he was a member of a section gang in the employ of the defendant engaged in track work at the Company's Albina yards, the handle of a chisel, which was being used in the removal of a bolt from a rail, broke. The chisel head flew off and struck him on the outside of the left leg just above the shoe top. Gangrene set in, making amputation of the leg necessary. The defendant denied that any such incident ever occurred. In view of the jury's verdict, however, we must assume that it did occur and in the manner which the plaintiff's evidence tends to prove.

The following, taken from the defendant's brief,

is a fair statement, based on the evidence, of the work going on at the time of the alleged accident:

> "* * * In removing bolts from angle irons, a necessary operation in changing rails, it is sometimes necessary to cut the nut off the bolt. This is often done with a chisel and a sledge or maul, and it is a two-man operation. The chisel is not like an ordinary carpenter's chisel, but is shaped more like a single-bitted axe, with a seven-pound head and a handle about two feet long fitted at right angles to the head. One man holds the cutting edge of the chisel against the nut by means of the wooden handle, and another man strikes the chisel with a sixteen-pound sledge, until the nut is cut away."

In his complaint the plaintiff charged the defendant with negligence in furnishing its employees with a defective chisel, in failing to inspect the chisel, and because the employee holding the chisel at the time of the alleged accident held it at an unsafe and improper angle, while the employee wielding the sledge or maul struck the head of the chisel a glancing blow, which caused the chisel handle to break and the metal head to fly off and hit the plaintiff's leg. There is a further allegation of negligence on the part of the defendant in failing to give plaintiff proper medical and surgical treatment after he was injured. This claim was withdrawn by the trial judge in his instructions to the jury, and, as there is no evidence to support it, no further mention need be made of it.

Plaintiff's evidence tended to show that, at the time of the alleged accident, two other members of the crew were engaged in cutting a nut off a bolt in the manner above described. Plaintiff's job was to distribute spikes and nuts to the crew. He was five or six feet away when the chisel head flew off, striking the outside of

his left leg above the shoe top and knocking him to the ground. There was evidence that the wooden handle of the chisel was rotten and water-soaked, and that the man wielding the sledge did not hit the chisel full on the head, but hit it a glancing blow which caused the handle to break.

The plaintiff testified that the head of the chisel weighed about seven pounds. The skin was broken at the place of the injury and a knot formed about the size of a dollar. "It felt like electricity running through there." He went to the bunkhouse that evening in a truck. The leg became worse, and he applied Sloan's Liniment to it and bathed it in warm water. The next morning he was unable to walk, and he "hopped" up to the nurse's office, but the nurse was too busy to see him. The swelling got worse, and he continued to bathe the leg in warm water and to apply liniment to it. On May 21 he saw Dr. Ralph M. Dodson, who was the chief surgeon of the Defendant Company for the district comprising Oregon, Washington and part of Idaho. Dr. Dodson gave him some white liniment to rub on his leg and told him to bathe it in hot water. Three days later he saw the doctor again, and was taken to Providence Hospital. He was moved from there to St. Vincent's Hospital, where his left leg was amputated, apparently about a month after the alleged accident, although the exact date does not appear in the record. During all this time the plaintiff testified that he suffered pain and part of the time was out of his head.

According to the plaintiff's testimony, he had never had a serious injury before, except an injury to his right foot when he was five years old, which caused him to walk with a limp, and had never had any trouble

with his left leg. He had done manual labor of various kinds since the age of thirteen, including the handling of heavy sacks of coal. He started to work for the defendant Company in Portland about a year before he was hurt.

With the exception of certain medical testimony, the material portions of which will be referred to in the discussion of the assignments of error, the foregoing is in substance the evidence on behalf of the plaintiff.

The first assignment of error is directed to rulings of the court denying defendant's motions for judgment of involuntary nonsuit, for a directed verdict, and for judgment notwithstanding the verdict. These motions were based upon the following grounds:

> "(1) There is no substantial evidence that defendant was negligent in any manner or particular as alleged in plaintiff's complaint, or otherwise; (2) there is no substantial evidence that the blow plaintiff claims he received was the proximate cause of the amputation of plaintiff's leg, which amputation is the only injury for which plaintiff seeks to recover; (3) the evidence affirmatively shows that the amputation was made necessary by gangrene due to a long established and progressive arteriosclerosis and there is no competent substantial evidence that the gangrene was caused by the blow plaintiff claims he received or by any aggravation of arteriosclerosis due to any such blow."

■ The defendant has not contended in this court that the evidence of negligence is insufficient. The evidence that defendant furnished its employees with a defective chisel, the breaking of the handle of which caused the plaintiff injury, warranted submission of the question of negligence to the jury.

■ The other two grounds of the motions are based upon what we think to be the erroneous assumption that the amputation of plaintiff's leg was the only injury for which he sought recovery. The complaint contains allegations that as a result of the defendant's negligence "the plaintiff suffered and sustained a severe injury to his left leg", and that "the plaintiff suffered and sustained severe contusions and lacerations and abrasions thereon and thereto and the veins, arteries, ligaments, nerves and tissues of the plaintiff's left leg were badly injured and damaged and the plaintiff was rendered sick and incapacitated". There was substantial evidence in support of some of these allegations, so that even though the evidence were insufficient to show that the negligence charged was the proximate cause of the loss of plaintiff's leg, still he would have been entitled to go to the jury on the other injuries alleged.

■ Defendant argues that because the court, in its charge to the jury, submitted only the question whether the amputation of plaintiff's leg was proximately caused by the blow and plaintiff took no exception, this is the law of the case and plaintiff is foreclosed from claiming injuries apart from the loss of his leg. We do not agree. If plaintiff were appealing he could not, of course, under these circumstances, complain of the instruction. But the doctrine of "the law of the case" does not, we believe, apply to a situation like this, but to successive appeals. See *Public Market Co. v. Portland,* 179 Or. 367, 373, 170 P. (2d) 586; *Rugenstein v. Ottenheimer,* 78 Or. 371, 152 P. 215, Ann. Cas. 1917E 953; 3 Am. Jur., Appeal and Error, 541, § 985, et seq.

The court, therefore, properly denied the various motions to which we have referred.

Another assignment of error, however, is based upon an exception properly taken to the court's instruction which submitted to the jury the question whether a condition of arteriosclerosis from which the plaintiff was suffering had been aggravated by the alleged injury, and whether such aggravation was the cause of the gangrene which made amputation of plaintiff's leg necessary. The ground of the exception was that there was no competent evidence of these alleged facts. We will first refer to the manner in which the plaintiff alleged his injuries and the course which the testimony took. Plaintiff alleged in his complaint that since the amputation of his leg he "has been informed that there is a possibility and that it is not unlikely and is, perhaps, true, that, prior to, and at the time of, the sustaining of said injury to his left leg, the plaintiff was afflicted with one or more and, probably, both of the diseases or infirmities, known as arteriosclerosis and osteomyelitis". He further alleged in substance that he had not been aware of the existence of these diseases, that they did not incapacitate him at all, but that, if he was so diseased, the injury—if it did not directly and solely cause the diseased condition—aggravated it and caused the setting in of gangrene in his injured left leg, making amputation of the leg necessary.

In his case in chief the plaintiff introduced no evidence concerning any pre-existing diseased condition. His only medical witness, Dr. Howard H. Mintz, testified in chief on the basis of a hypothetical question that the plaintiff's injury would have called for immediate medical attention, and plaintiff rested his case without any medical evidence whatever that the injury caused the loss of his leg. The defendant then estab-

lished by uncontradicted evidence that the plaintiff, at the time of the injury, was suffering from arteriosclerosis in his left leg, which, in the opinion of Dr. Dodson, who amputated the leg, and Dr. Frank R. Menne, the pathologist who examined the leg after the amputation, was so severe that it caused gangrene to set in, necessitating amputation. Thereafter, in rebuttal, the plaintiff undertook to prove the charge in his complaint (made in the alternative) that the cause of amputation was aggravation of the arteriosclerosis by the blow. The court, without objection on the part of the plaintiff, submitted the question of aggravation to the jury as the only question for their consideration on this phase of the case. Counsel for the plaintiff expressly conceded on the oral argument here that the plaintiff had ''a pronounced condition of arteriosclerosis'' and that the issue in the case was whether ''the arteriosclerosis caused the gangrene just by that disease developing of itself'' or the disease was ''aggravated and lighted up by receiving this blow on the leg by this flying, heavy chisel.''

■ From the foregoing it will be seen that what the plaintiff did was to attempt to prove in rebuttal, instead of in his case in chief, that the alleged accident was the proximate cause of aggravation of arteriosclerosis and the consequent loss of his leg. This procedure was objected to by the defendant, and the adverse ruling is assigned as error. It is unnecessary to pass on the question, since the judgment must be reversed for other reasons. It should be observed, however, that, whatever may have been the justification for this novel course, there will be no excuse whatever for any similar procedure on another trial. It will then be the duty of the plaintiff to establish the

fact of aggravation of a pre-existing diseased condition (if that is what he continues to rely upon) as a part of his case in chief, and he should not be permitted to reserve for his rebuttal the proof of proximate cause, thus seeming to cast upon the defendant the burden of showing that the alleged aggravation was not the proximate cause of the loss of plaintiff's leg.

We return to the question of the sufficiency of the evidence to support a finding that the injury was the proximate cause of gangrene and the amputation.

Arteriosclerosis (commonly called hardening of the arteries) is a disease of the arteries attributable to many causes, but generally, as Dr. Menne testified, "said to be due to the wear and tear of life". The walls of the blood vessels thicken and their openings become small, thus bringing about an obstruction to the arteries and impaired circulation. In very severe cases gangrene—the death of an extremity—may result. The disease is insidious and progressive, and its effects differ according to the individual case. A man may have it and not know it. He may have it and still engage in hard manual labor until something occurs which causes him to realize that he has it. It is not uncommon in persons of the age of forty-two, which was the plaintiff's age at the time of the alleged accident.

The substance of the foregoing appears in the evidence and is not disputed.

When Dr. Dodson examined the plaintiff he ascertained from an X-ray picture, taken on May 21, 1946, four days after the alleged accident, that there was an old osteomyelitis in the lower end of the tibia in his left leg. In an attempt to relieve this condition by getting drainage, Dr. Dodson drilled holes in the bone, which is standard practice. But there was no pus and

this operation made no difference in the plaintiff's condition except that it lowered his temperature and his blood count. Dr. Dodson and Dr. Menne are agreed that the osteomyelitis was of long standing. They also testified, and plaintiff concedes, that it had nothing to do with the amputation. At the time that he drilled into the bone Dr. Dodson observed that the bleeding was very poor, and when the amputation was done there was very little blood or none at all.

Dr Dodson testified that the gangrene in the foot developed from the arteriosclerosis, which was of long standing and was the reason for the operation, and that the gangrene had no relationship to the alleged blow.

Dr. Menne is the pathologist in charge of the laboratories at St. Vincent's Hospital. In the regular course of his duties he made a pathological examination of the amputated leg. His diagnosis was gangrene due to arteriosclerosis in the presence of osteomyelitis. He thought the arteriosclerosis had persisted for at least a year.

Dr. Menne testified:

"We had for examination the left lower extremity from a point below the knee including the foot. And briefly, the—on the anterior surface of the leg just above the ankle there was an area of sloughing away which was about six inches long and about two inches wide. The foot itself appeared somewhat dried and shrunken. We dissected out the blood vessels in that leg and found that the vessels extending down from behind downward; that is, the arteries, those vessels which carry the blood downward, were almost completely shut off. That is, their walls were thickened and their openings very small. We opened up the portion of the bone where the drill holes were made by the surgeon and found

at the upper end of the bone close to the upper end of the wound that there was a little inflammation and the outside portion of the bone which was old, but there was no real pus formation in the bone itself. There was, however, a degeneration and pus in this wound which was the old operating wound of the leg. And the skin itself was soft and was peeling back and sloughing away. And our conclusion from the findings based upon the gross examination and the microscopic appearance was that here was an obstruction to the arteries, the main artery and the branches down to the leg, due to arteriosclerosis or what is commonly called hardening of the arteries, and that there had resulted, therefore, a gangrene which means a—the death of an extremity. From the pus formation and degeneration it was our interpretation that this was probably due to a poor blood supply to the operative field where the old osteomyelitis was found. Osteomyelitis is an inflammation of the bone.''

The ''drill holes'' referred to in the foregoing were those made by Dr. Dodson in an attempt to relieve the osteomyelitis.

Although there is some claim in plaintiff's brief to the contrary, we find nothing in the testimony of Dr. Dodson or Dr. Menne, whether on direct or cross-examination, which lends any support to plaintiff's contention that the alleged injury had a connection with the gangrene and the amputation. In the discharge of their professional duties in this case neither had been given a history of a recent injury, and Dr. Menne, who has practiced his profession since 1915 and is a man of eminence in his particular field, testified that he had had no experience with injuries in connection with arteriosclerosis. The evidence is uncontradicted that the artery to be affected lies deep in the leg between the two bones of the leg, the tibia and the fibula, and

thus is protected from external violence, and Dr. Menne testified that it would be unlikely for the artery to be injured by an external blow on the outside of the leg if the blow were not sufficient to break one of the bones. There was no evidence that either bone had been broken or injured in any way.

Dr. Mintz, the expert witness for the plaintiff, has practiced his profession since 1944. He examined the plaintiff on January 7, 1948, five days before the commencement of the trial, for the purpose of qualifying himself as a witness. He had never seen the plaintiff before.

When he was called in rebuttal a hypothetical question was put to him which assumed that the plaintiff "was suffering from arteriosclerosis and also osteomyelitis, but assume that if that condition was present in his system, it was not of any disabling character". The question recited various kinds of manual labor which the plaintiff had done and the facts concerning the alleged injury and some of the subsequent treatment, and concluded: "What would be the probable effect upon that man from the receipt of such an injury?" The defendant objected to the question "on the grounds that it is not a proper hypothetical question and the form is bad and, more fundamentally, under the proposition that this is not a proper subject for rebuttal testimony." The objection was overruled, and the witness answered: "I would like to make a little distinction between arteriosclerosis and osteomyelitis. Now he may have had some arteriosclerosis before but not any osteomyelitis, and then any injury that he had would have aggravated the arteriosclerotic condition but there was no osteomyelitis there before and that was in conjunction with the injury." The witness was

then asked to confine his attention to the arterio-sclerosis, and was asked "what effect, what would be the probable effect of such a blow upon that arterio-sclerosis condition?" He answered: "Would have aggravated the arteriosclerosis." "Q And to what extent might it aggravate it?" "A That it might have caused a clotting or plugging up of the artery enough to cause gangrene of the toes and foot." All this testimony was received over the objection of the defendant.

Counsel for the defendant contend that the evidence is speculative and conjectural, and argue that testimony of a physician in a case like this, which goes no further than to point to the possibility of a claimed effect from a particular cause is not enough and that such evidence must show that the result is probable. Otherwise, the proof does not measure up to the accepted standard of reasonable certainty. They further argue that the hypothetical question, which was the basis of Dr. Mintz' testimony, did not fully and accurately portray the facts of the plaintiff's physical condition before the injury, and, therefore, that his testimony is without probative value. Finally, it is said that Dr. Mintz' testimony revealed that he based his answers partly on statements made to him by the plaintiff, which themselves would have been inadmissible in evidence and the nature of which was undisclosed, and that for this reason also his testimony must be rejected.

■ It will be recalled that while Dr. Mintz testified that the injury would have aggravated the arteriosclerotic condition, when asked to state the extent of the aggravation, he answered that "it *might* have caused a clotting or plugging up of the artery enough to cause

gangrene of the toes and foot." Before a case can be submitted to a jury in this jurisdiction the proof of material issues must have the quality of reasonable certainty, and a finding dependent upon conjecture and speculation will not be permitted to stand. *McKay v. State Ind. Acc. Com.,* 161 Or. 191, 198, 87 P. (2d) 202; *Vale v. State Ind. Acc. Com.,* 160 Or. 569, 576, 86 P. (2d) 956; *Frint v. Amato,* 131 Or. 631, 647, 284 P. 183.

■ Numerous cases have been cited by the plaintiff which support the statement in Rogers on Expert Testimony (3d ed.) 324, that "a medical witness may be asked to express his opinion as to whether a given injury might or could have produced a given result as indicating the scientific possibility of what the other evidence tends to prove." See, also, 20 Am. Jur., Evidence, 667, § 795; *Jackson v. Harries,* 65 Utah 282, 236 P. 234, with authorities cited at pp. 291 and 292, including extensive note in L. R. A. 1915A 1056; *Marbury v. Illinois Cent. R. Co.,* 176 Fed. 9; *Simon v. S. S. Kresge Co.,* (Mo. App.) 103 S. W. (2d) 523. The question here, however, is not one of the admissibility, but of the sufficiency, of evidence; and medical testimony in terms of mere possibility will not lift the case out of the area of uncertainty if the other evidence leaves the question speculative. The following from the opinion of the court in *Burton v. Holden & Martin Lumber Co.,* 112 Vt. 17, 20 Atl. (2d) 99, 135 A. L. R. 512, is an excellent statement of what we consider to be the correct rule:

> "There are many cases where the facts proved are such that any layman of average intelligence would know, from his own knowledge and experience, that the injuries were the cause of death. In such a case the requirements of law are met without expert testimony. State v. Rounds, 104 Vt 442,

456, 160 A 249. But where, as here, the physical processes terminating in death are obscure and abstruse, and concerning which a layman can have no well-founded knowledge and can do no more than indulge in mere speculation, there is no proper foundation for a finding by the trier without expert medical testimony. * * *

"Since expert evidence that an incident can or cannot cause a certain result may affect the conclusion to be reached [citing cases], it follows that in the case of injuries so naturally and directly connected with the accident that proof of causation does not depend upon expert evidence, medical testimony of 'possibility' may corroborate the other testimony. But unless the facts, outside such medical testimony, fairly warrant the conclusion that the injury resulted from the accident, causation is not established."

The cases digested in 135 A. L. R. 517–529 fully support the statement of the annotator at p. 528: "There appears to be little dissent from the view that expert evidence as to the possibility of a causal relation between an injury and a subsequent physical condition or death is by itself insufficient to establish such relation." See, also, 32 C. J. S., Evidence, 399, § 569d.

So far, we have medical testimony, based on a hypothetical question addressed to a doctor who never saw the leg, that the blow might have aggravated the arteriosclerosis to the extent that it would cause gangrene; medical testimony of the surgeon who attended the man and amputated his leg, and of the pathologist who, in the regular course of his duties, examined the specimen for the purpose of determining the condition which made the amputation necessary, that it was improbable that the blow aggravated the arteriosclerotic condition; and the history of the plaintiff and

the injury to his leg, followed by pain and suffering, gangrene, and ultimate amputation.

■ This evidence is wholly insufficient, in our opinion, to support the jury's finding. Laymen have no such knowledge of matters of this kind as to enable them to say with any degree of certainty that the claimed aggravation was caused by the blow. That this was a medical question is self-evident. As in *Burton v. Holden & Martin Lumber Co.,* supra, "the physical processes terminating in [amputation] are obscure and abstruse." "The question was one to be determined by scientific method and opinion." *Kelsey v. Armour & Co.,* 119 Kan. 837, 842, 241 P. 453. Even Dr. Menne, with all his vast experience, had had no experience with injuries which aggravated arteriosclerosis. Without competent medical testimony that the blow which the plaintiff received was the probable cause of the gangrene and resulting amputation, there could be no case sufficient to go to the jury on that question.

The plaintiff contends, however, that the following testimony given by Dr. Mintz on cross-examination supplies the deficiency in the proof:

"Q If Dr. Menne testified here that in his opinion there was not a causal relationship between any blow on the outside of the left leg and the development of arteriosclerosis and gangrene in that leg, you would agree with that, would you not?

"A Well, I feel that his opinion and my opinion is different.

"Q Your opinion is different?

"A Yes. Different. That there was a relationship between the injury and the gangrene that this man had had.

"Q But you never saw the leg at all?

"A No, I never saw the leg; had no opportunity to do that.

"Q The only time you did see Mr. Henderson here was just about a week or so ago, is that right?

"A On January 7, 1948."

Later in his cross-examination Dr. Mintz expressed the opinion that there was no osteomyelitis in the plaintiff's left leg before the alleged injury, and that it was caused "indirectly" by the blow. An X-ray picture, taken four days after the accident, showed the presence of this disease. Dr. Mintz took issue with Dr. Dodson and Dr. Menne on the question how old the osteomyelitis was, and swore that he thought it probable that it developed between the date of the alleged injury, May 17, and the date the X-ray was made, May 21. He based that opinion on the history "that I got from him" (plaintiff) and his examination of the plaintiff. He testified that "he might have had arteriosclerosis before, but the thing is that that blow on the leg aggravated anything he had there before."

He was cross-examined as to the possibility of a blow on the outside of the leg affecting the artery without injuring the bone, and gave the following testimony:

"Q But, as a matter of fact, the artery lies between the tibia and fibula deep in the lower left leg, doesn't it?

"A Yes, it does.

"Q So that the artery is very well protected, is it not, by a bone on either side and flesh all around it?

"A Well, it is protected from a direct injury to some extent.

"Q And, in order to—You couldn't do direct damage to that artery from a blow on the side of the leg without damaging the bone that is on that side, could you?

"A One minute. It is possible to do injury to one part without damaging another part.

"Q You can damage the inside part without damaging the outside part first?

"A Well, depends upon what you are referring to. You see, that artery can be damaged indirectly from that blow.

"Q Even though it didn't damage the bone that is on both sides of the artery?

"A Well, it is possible that it could injure the bone too.

"Q Do you know whether or not it did in this case?

"A Well,—

"Q You don't know?

"A Well, from the x-rays, I would say that it did, that there is some injury to the bone.

"Q Well, that is interesting. What x-rays are you talking about?

"A Well, there is that osteomyelitis there.

"Q Oh, we are talking about osteo now and not injury. Osteo isn't an injury?

"A Osteo is an infection but it is related.

"Q Sure, it isn't an injury at all.

"A But it is related to an infection—to the injury.

"Q Sure.

"A And related to the injury.

"Q I see. Even though the osteo is not in the part of the leg that was hit, you would say that that

would still be related to some injury; even though it is not in that part of the leg?

"A Well, the part of the leg that had the osteo was just distal, was just beyond the part that was injured.

"Q Wasn't the part that he claims was hit at all, was it?

"A I didn't say that osteo was directly due to this injury."

Two things are apparent in the testimony of Dr. Mintz: First, that he at no time testified with reference to the precise condition of arteriosclerosis from which the plaintiff was suffering as shown by the evidence; and, second, that he based his opinion partly at least on facts which he learned from the plaintiff and concerning which there was no evidence.

It is undisputed that arteriosclerosis is a progressive disease, and that in the case of the plaintiff it was not in its initial stage, but had existed for a long period and was pronounced—so much so that when, on May 21, Dr. Dodson drilled holes in the bone of the leg in an effort to relieve the osteomyelitis, the "bleeding was very poor." Dr. Mintz was never asked a question which assumed that character of disease. He was simply asked to assume that the plaintiff was suffering from arteriosclerosis, a premise which gave no indication of the seriousness of the condition.

That his testimony did not have reference solely to the facts assumed in the hypothetical question addressed to him but as well to information otherwise obtained, appears in several places in the record. When he was first on the stand during the plaintiff's case in chief and testified to the treatment which the plaintiff should have been given, he was asked on cross-examina-

tion: "Now, when you say that, you are talking about some treatment that you would prescribe, but you, of course, don't know what the condition of the leg was?" and he answered: "Well, I have a good idea from the history." When he was called in rebuttal and the hypothetical question was put to him on his direct-examination he volunteered that "he might have had some arteriosclerosis but not any osteomyelitis", and again on cross-examination he said: "What I want to point out is that he might have had arteriosclerosis before but the thing is that that blow on the leg aggravated anything he had there before."

Dr. Mintz' opinion that the blow caused the osteomyelitis was, according to his own statement, based upon the history given him by the plaintiff. That opinion and its background cannot be separated from his judgment as to the connection between the blow and the gangrene. He himself combined the two in the explanation he gave when asked whether damage could be done to the artery without damaging the bone and in his sweeping statement that the blow "aggravated anything he had there before."

There is considerable authority for the rule that a hypothetical question must include all the essential undisputed facts shown by the evidence. *People v. Vanderhoof*, 71 Mich. 158, 176, 39 N. W. 28; *Kelsey v. Armour & Co.*, 119 Kan. 837, 241 P. 453; *Peterson v. Cochran & McCluer Co.*, 308 Ill. App. 348, 31 N. E. (2d) 825; *Wolczek v. Public Service Co.*, 342 Ill. 482, 174 N. E. 577; *Benefit Ass'n of Ry. Employees v. Hulet*, 107 Ind. App. 633, 26 N. E. (2d) 548; Rogers on Expert Testimony (3d ed.) 105, § 51; 32 C. J. S., Evidence, 354, § 551. But, see 2 Wigmore on Evidence (3d ed.) 810, § 682. That the extent, duration and seriousness of the

arteriosclerosis from which plaintiff was suffering was a material fact and undisputed, cannot be doubted. And it is a grave question in this case whether Dr. Mintz' testimony, based as it was on an inadequate and misleading premise, is for that reason entitled to any weight at all.

■ But, putting that to one side, his categorical statement on cross-examination that there was a connection between the blow and the gangrene is without probative value because it was based, partly at least, on the history given him by the plaintiff.

■ It is the rule in this state, as elsewhere, that "an expert, though thoroughly qualified as a witness, cannot be permitted to give an opinion upon facts known to him, and not communicated to the jury"; that "no allegation can be proved by the *ipse dixit* opinion of any expert unless the facts or phenomena upon which he bases his opinion are disclosed either by his own testimony or that of other witnesses." *State v. Willson,* 116 Or. 615, 619, 620, 241 P. 843; *State v. Simonis,* 39 Or. 111, 116, 65 P. 595. See, also, *Lippold v. Kidd,* 126 Or. 160, 164, 269 P. 210, 59 A. L. R. 875; Rogers, op. cit., 106, § 52; Wigmore, op. cit., 792-3, § 672, 799, § 680. In *Lippold v. Kidd* we said:

"The expert witness is granted the privilege of expressing to the jury an opinion because his superior training enables him to arrive at a conclusion which is more likely to be sound than that of the average juror. But all opinions are based upon facts; generally the recipient of an opinion is at a loss to know what use he may advisedly make of an expert's opinion unless he also knows what facts the expert took for granted when he formulated his conclusion."

In the present case Dr. Mintz relied on facts which not only were not in evidence but which could not have been admitted in evidence—the *ex parte* statements of the plaintiff made to the witness, not as communications between doctor and patient but between a party to a lawsuit and a doctor examining him for the purpose of qualifying himself to testify as an expert on the former's behalf. *Watrous v. Salem Brewery Ass'n.,* 151 Or. 294, 303, 49 P. (2d) 375; *Wise v. State Ind. Acc. Comm.,* 148 Or. 461, 35 P. (2d) 242; *Reid v. Yellow Cab Co.,* 131 Or. 27, 279 P. 635, 67 A. L. R. 1. In a similar case the court said:

" * * * The opinion of the doctor is indivisible; it must be accepted or rejected as a whole; there is nothing to indicate how much it rests on the declarations, and how much on personal observation. The jury should not have been allowed to guess what it would have been in the absence of the declarations, or any part of them, and to estimate its value accordingly." *Delaware, L. & W. R. Co. v. Roalefs,* 70 Fed. 21, 24.

Counsel for the defendant moved to strike Dr. Mintz' testimony concerning aggravation of arteriosclerosis, after the basis of his testimony had been disclosed. The court denied the motion. We think that it should have been allowed.

In view of the legal principles to which attention has been called, we are of the opinion that there was no substantial evidence to support the claim that the alleged injury aggravated plaintiff's arteriosclerosis to the extent that it brought on gangrene and the amputation of plaintiff's leg, and that the court erred in submitting that issue to the jury.

In view of a new trial, other assignments of error must be considered.

The defendant requested the court to withdraw from the jury the plaintiff's charge that the defendant was negligent because the employee wielding the maul struck the head of the chisel a glancing blow. The court refused the request and submitted the question to the jury. Exceptions to these rulings are made the basis of an assignment of error.

It should be first observed that, while the pleading alleged that "the employee holding the chisel held the same at an improper and unsafe angle and position", there was no proof of this allegation, and it was withdrawn by the court. The only evidence as to how the chisel was struck was given by a member of the section crew, Vernon Rushing, who testified on the point as follows:

"Well, we were working there and this fellow was picking up old scraps and stuff and he was about a distance from where the fellow was cutting bolts from here to the table there (indicating), and this fellow struck the chisel with a glancing lick and that caused the glancing—it caused it to break and it hit this fellow on the leg (indicating)".

"Well, he glanced a lick, hit a glancing lick. He didn't hit it full on the head, is what I was trying to say. See, he didn't hit it solid like. He hit a glancing lick. That caused the handle to break."

Since the defendant denied the occurrence altogether, and supports its denial by evidence, there was, of course, no testimony on its part as to the manner in which the chisel was struck.

In support of their assignment of error counsel for the defendant argue:

"It is a matter of common knowledge that the human body is not so constructed that it can operate with the precision and accuracy of a machine. Any-

one who has ever hammered a nail or played a game of golf knows that when the end to be accomplished is the striking of an object with an instrument such as a hammer or golf club, a perfect blow cannot be struck with every attempt.

"The law recognizes and allows for such human frailty and where the plaintiff must prove negligence in order to sustain a recovery, it is not sufficient to produce evidence which goes no farther than to show that an injury has occurred due to some failure which reasonable care cannot necessarily avoid."

Counsel for the plaintiff concede in their brief that the foregoing contention "may have some merit where the object to be struck is in good order", but not in the case of a chisel with a defective handle. On the oral argument counsel for the plaintiff said with reference to defendant's contention: "Now, my position is that that would ordinarily be true if it was not for the fact that the chisel was a defective chisel", but in the latter instance he asserted that it would be a question of fact for the jury. The principle invoked by the plaintiff is that the care which should be exercised must be proportioned to the danger reasonably to be apprehended, citing Restatement, Torts, §§ 298, 299.

But, whether the chisel handle was defective or not, there must be some evidence from which the trier of the fact can reasonably find that the wielder of the maul failed to use the degree of care which the situation demanded. It is not charged that the defendant employed an unskilled workman. Neither is it alleged that the danger was so obvious that it was negligence to strike the chisel at all. In essence, the fault lay in not hitting a perfect blow. The cause of the failure in this instance does not appear; it may have been any one

of a number of different conceivable causes other than negligence, and to exclude all other such causes and attribute the occurrence to negligence would be sheer speculation.

*Ruping v. Oregon Short Line R. Co.*, 51 Utah 480, 171 P. 145, is squarely on the point. The court held that the mere fact that a man struck a railroad spike a glancing blow with a sledge was no evidence that he was negligent. As here, there was no claim that the defendant employed an unskilled workman. The decision was placed on the ground, among others, that "it is a physical impossibility to expect anyone in driving railroad spikes, however careful or competent, to at all times strike them a direct blow."

A similar case is *Lancaster v. Taylor*, (Tex. Civ. App.) 281 S. W. 654, where the defendant was charged with negligence because the employee holding a chisel moved and as a result the man wielding the sledge missed the head of the chisel. After referring to the vague character of the testimony, the court said:

"But, conceding that the jury might have found from that evidence that Riggs did move the chisel 'a little' is that bare fact sufficient to find that Riggs was also negligent? This is not a situation in which negligence can be inferred from the mere happening of the act that caused the injury. There are many things besides carelessness which might cause one holding a chisel in that manner to move it 'a little'. Appellant is not legally liable to the appellee, unless its servants who caused the injury were guilty of a lack of ordinary care for others while doing their work, and juries have no right to arbitrarily find negligence when there is no proof of any."

In *Missouri Pac. R. Co. v. Medlock*, 183 Ark. 955, 39 S. W. (2d) 518, the court held that evidence that a

member of a section gang, engaged in lifting a motor car and turning it around, stumbled and released his hold, thus allowing the weight of the car to rest upon the plaintiff and injure him, was not sufficient to make a question of fact upon the issue of negligence, the court saying:

" * * * Had the testimony tended to show even inferentially that the slipping or stumbling was due to a failure on the part of Sleepy Reeves to watch where he was walking, or to walk as slowly as he should, or to inattention or disobedience or other misconduct in the performance of his duties, then such testimony would have created a question of fact upon the issue of negligence for determination by the jury; but, since the cause of the slipping was conjectural only, it was improper to submit the issue of negligence to the jury."

The plaintiff has cited, among other cases, *Christie v. Great Northern Ry. Co.*, 142 Or. 321, 20 P. (2d) 377, which sustained a judgment for the plaintiff, who was injured while engaged with another employee of the railway company in unloading from a box car a heavy pair of engine wheels mounted on an axle. The other employee was the conductor of the train and plaintiff's superior and vice principal. The plaintiff alleged that the conductor negligently released his hold of the axle and that the defendant failed to direct a sufficient number of men to assist in shifting the wheels. The evidence showed that in moving the wheels the conductor let go of the end of the axle opposite to the end which the plaintiff was holding, and that the plaintiff was injured as a result. The plaintiff at the time was acting under the direction of the conductor, and the court said that "the two allegations of negligence are so intimately connected that we think they can be con-

sidered together". 142 Or. 326. It is to be doubted that the case is to be considered as authority for the proposition that the mere act of the conductor in releasing his hold, without the other circumstances shown, was itself evidence of negligence. We think the case is not controlling here. The other cases cited by the plaintiff, *Ranstrom v. International Stevedoring Co.*, 152 Wash. 332, 277 P. 992; *Pitcairn v. Devlin*, 111 F. (2d) 735; and *Chesapeake & O. Ry. v. Craig*, 229 Ky. 365, 17 S. W. (2d) 224, may all be distinguished on their facts, though the Ranstrom case comes near to supporting the plaintiff's position.

■ In our opinion, it was error to submit this charge of negligence to the jury, as there is nothing in the evidence to justify an inference that the employee who wielded the maul was inattentive, or struck the blow in any other than the orthodox way, or otherwise failed to act as a reasonably careful man doing the job he had to do.

While, as stated earlier in this opinion, the defendant has not contended that the evidence that the chisel was defective was not sufficient to warrant a finding of negligence, it does contend that no duty rested upon it to inspect such tools. It raised this question on the trial by the following requested instruction, the refusal to give which is assigned as error:

"I instruct you that the chisel which plaintiff claims was broken in this case was what is known as a simple tool, and the employer is under no obligation to inspect and observe the condition of simple tools, the condition of which is constantly changing in use. When a proper tool of this simple character is provided, and changes occur in its condition from day to day, by the ordinary and regular use thereof, the employer is under no obligation to

> follow it up and see that its condition is always safe, when the employees are just as competent as the master to see and remedy the defects, if any, or call it to the attention of the employer."

Instead of giving the foregoing request, the court instructed the jury on the duty of the defendant to inspect the tools furnished its employees.

■ The requested instruction is based upon the "simple tool" doctrine, limited, however, in this instance to the question of the duty to inspect. As stated in the defendant's brief, "In the case at bar the problem is narrow; we are not concerned with the 'simple tool' doctrine as it relates to the duty to furnish reasonably safe tools, but only with whether there is any duty to inspect such tools from day to day after they have been furnished." The argument in support of the defendant's contention revolves around the 1939 amendment to the Federal Employers' Liability Act (45 U. S. C. A., § 54, as amended by the Act of August 11, 1939), which provides so far as here pertinent: "That in any action brought against any common carrier * * * to recover damages for injuries to * * * any of its employees, such employee shall not be held to have assumed the risks of his employment in any case where such injury or death resulted in whole or in part from the negligence of any of the officers, agents, or employees of such carrier". We shall not stop to examine in detail the able argument in the defendant's brief in support of its view that failure of an employer to inspect a simple tool is not negligence, and therefore that the "simple tool" doctrine was not abolished by abolishing assumption of risk. It is sufficient to say that it is in substance the same argument which the Supreme Court of the United States, speaking through Mr. Justice

Black, rejected in *Tiller v. Atlantic Coast Line R. Co.,* 318 U. S. 54, 87 L. ed. 610, 63 St. Ct. 444. While the "simple tool" doctrine was not directly involved in that case, the court made it amply clear that that doctrine, along with all the other phases of assumption of risk which have grown up in the law, was intended to be swept away by Congress. The legislative history referred to in the opinion (318 U. S. 66), as also the excerpt from the House Committee Report (318 U. S. 64, Note 17) indicate that this was the legislative intent. The court said: "We hold that every vestige of the doctrine of assumption of risk was obliterated from the law by the 1939 amendment, and that Congress, by abolishing the defense of assumption of risk in that statute, did not mean to leave open the identical defense for the master by changing its name to 'non-negligence.'" The decision and its rationale leave no room for any other court to hold that an employer's failure to use ordinary care in inspecting the tools, whether simple or complex, furnished to its employees, may be classed as "non-negligence", thus enabling the employer to escape the sweep of the prohibition in the 1939 amendment. See *Pitt v. Penn. R. Co.,* 66 F. Supp. 443, affirmed by evenly divided court, 161 F. (2d) 733. Cf. *Jacobs v. City of New York,* 315 U. S. 752, 86 L. ed. 1166, 62 S. Ct. 854.

■ Much of the discussion in the briefs is devoted to the court's denial of defendant's motion for a mistrial for alleged improper argument by counsel for plaintiff. We do not suppose that such an incident will occur again, but the matter should not be permitted to go unnoticed. During the course of the closing argument to the jury, one of plaintiff's counsel addressed individual jurors by name and asked and extracted from

them their oral agreements with him that he was correct in certain statements he was making. He also sought advantage before the jury by referring to the exercise by the defendant of one of its peremptory challenges. The trial judge sustained repeated objections by defendant's counsel to the argument, but, as stated, denied the motion for mistrial. Since the judgment must be reversed for reasons already given, it is, of course, unnecessary to determine whether the ruling was an abuse of discretion. But it should be said that tactics of the kind described are reprehensible and ought not to be tolerated in a court of justice.

The judgment is reversed and the cause remanded for further proceedings in conformity to this opinion.